## S02A1207. HINELY v. THE STATE.
(573 SE2d 66)

HINES, Justice.

Hinely appeals his conviction for felony murder in connection with the death of Eugene "Sonny" Ashley.[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that at 7:00 a.m. on May 1, 1999, Hinely and Darlene Middleton began smoking crack cocaine. The small amount they had quickly ran out, and Middleton had Hinely drive her to Ashley's house to get some money; she described her relationship with Ashley as "like a boyfriend-girlfriend thing," and she would periodically perform oral sex on Ashley in exchange for money. When Hinely and Middleton approached Ashley's house in Hinely's white Chevrolet S-10 pickup truck, Middleton switched to the driver's seat and Hinely "crouched down" in the passenger's seat to avoid being seen. Middleton told Ashley she needed money for gas and he gave her five dollars. Middleton and Hinely left, purchased crack cocaine with the five dollars, and quickly smoked it. They returned to Ashley's house, repeating the switch of drivers and Hinely's concealment, and this time Middleton got ten dollars from Ashley. Middleton and Hinely again left, pur-

---

[1] Ashley was killed on May 1, 1999. On March 22, 2000, a Long County grand jury indicted Donald H. Hinely, Jr., and Darlene Middleton for malice murder, felony murder in the commission of armed robbery, and felony murder in the commission of aggravated assault. On April 25, 2000, the State filed a notice of intent to seek the death penalty against Hinely. Hinely was tried alone before a jury on February 26-27, 2001, and March 6-9, 2001, and found not guilty of malice murder, and guilty on both counts of felony murder. On March 9, 2001, Hinely negotiated a sentence of life in prison without the possibility of parole, and he was so sentenced on that date. Hinely moved for a new trial on April 2, 2001, and amended the motion on January 3, 2002. The motion was denied on January 9, 2002, and Hinely filed a notice of appeal on January 25, 2002. His appeal was docketed in this Court on April 24, 2002, and submitted for decision on June 17, 2002.

chased crack cocaine, and smoked it.

By this time, it was late enough for the restaurant at which Middleton worked to be open, and she and Hinely went there, obtained Middleton's pay check, cashed it, purchased some groceries, and then bought three "$20" units of crack cocaine. After they consumed this, they returned to Ashley's house. This time, Middleton drove Ashley to the store where he bought some wine; Hinely concealed himself outside the house until they left, and then searched the house for money. When Middleton and Ashley returned, she performed oral sex on him in exchange for twenty dollars. She and Hinely left, and again purchased crack cocaine and smoked it.

Middleton and Hinely went to the home of Gil Thompson. While there, Hinely went to the rear of the house for 15 minutes and took a pocket knife from the night stand of Thompson's brother. Hinely also borrowed a roll of duct tape, stating that he needed to repair his truck. He and Middleton then discussed a scheme to rob Ashley; Middleton was aware that Ashley received Social Security checks on the first and third days of each month. When they arrived back at Ashley's house, Middleton went inside and asked to use the bathroom. While she was inside the bathroom, Hinely entered the house, and Middleton heard Hinely ask if Ashley had any money. As Middleton exited the bathroom, she heard Hinely hit and slap Ashley. When she entered the living room, Ashley was seated in a chair while Hinely was hitting him around his face and head and asking for money. Hinely also held the knife he had taken from Thompson's home. Middleton told Hinely: "Let's just forget it. Let's go." Hinely replied: "Shut up before I kill you too." Hinely taped Ashley's wrists together with the duct tape, picked him up, and carried him into Ashley's bedroom. Middleton heard Ashley say, "You done cut my throat," and, "Please don't kill me." Middleton ran from the house and jumped into Hinely's truck. After several minutes, Hinely emerged from the house, got into the truck and told Middleton, "I think I killed him." There was blood on Hinely's clothes. This last visit to Ashley's house was somewhere between 4:00 p.m. and 6:00 p.m.

During one of Middleton's and Hinely's visits to Ashley's house, a relative of Ashley's, together with friends, came to visit Ashley. They saw Middleton inside the house, and she immediately left. They also saw Hinely "slouched down" in the passenger's seat of the pickup truck.

After Hinely and Middleton left Ashley's house, they drove to the home of Hinely's great-grandmother, where Hinely got a check for $200; Middleton did not enter the house. Hinely and Middleton went to a grocery store where Hinely cashed the check; they then bought more crack cocaine. Hinely gave Middleton crack cocaine worth

between $120 and $160. Hinely dropped Middleton off in the vicinity of her home and told her she needed to leave town. She responded that she would not do so, and he told her that she was stupid and would go to jail. Hinely returned to his great-grandmother's home and spent the night, which he rarely did. The next day, he went to the home of Middleton's aunt, where Middleton was, and said that he wanted Middleton to go "somewhere" with him. She would not. At this time, Hinely was driving a white car rather than the pickup truck. Later that day, he left town, and was later apprehended in the Atlanta area.

Ashley's body was found May 2, 1999, lying face up on a storage trunk in his bedroom. His wrists were taped together with duct tape and his arms were over his head. His ankles were also taped together with duct tape. The knife Hinely had taken from Thompson's house was discovered hidden under some neckties in a wardrobe locker in the bedroom, near the body. Ashley had been stabbed in the left side of the neck. There was bruising to the left side of his face, and mucous blood seeped from his mouth and nose. He died as a result of "positional asphyxia complicating blunt head injury and stab wound of the neck, with binding of the extremities." His wallet was found in the front yard of his house. When Middleton learned of Ashley's death, she telephoned the police, went to the sheriff's office, and made a statement.

Hinely and Middleton were charged in the same indictment. Middleton pled guilty to malice murder and testified at Hinely's trial.

1. Hinely contends that the evidence was insufficient to enable a rational trier of fact to find him guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Hinely specifically contends that there was no evidence to corroborate the testimony of Middleton, his accomplice. See OCGA § 24-4-8. However,

> [t]he corroborating evidence connecting a defendant to a crime may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that the defendant participated in the crime. [Cit.] Whether the corroborating evidence is sufficient is a matter for the jury, and even slight evidence of corroboration connecting an accused to a crime is legally sufficient. [Cits.]

*Klinect v. State*, 269 Ga. 570, 572 (1) (501 SE2d 810) (1998).

Middleton's testimony was corroborated. The body was found in a manner consistent with her testimony. Thompson testified that Hinely took a roll of duct tape from Thompson's house, and such was

found in Ashley's living room. No duct tape had been used to repair Hinely's pickup truck. Thompson also identified the pocket knife that was found in Ashley's bedroom as the one kept on his brother's night stand. Ashley's relative and her friend saw Hinely at Ashley's house, trying to avoid detection. Other witnesses saw Hinely and Middleton driving together in his white pickup truck on May 1, 1999, in the vicinity of Ashley's house, and saw the truck turn off the main road and drive down the dead-end road toward Ashley's house between 3:30 p.m. and 4:00 p.m. Hinely's stepfather confirmed that Hinely drove a white Chevrolet S-10 pickup truck, and Hinely's great-grandmother corroborated Middleton's testimony that Hinely drove to his great-grandmother's home. Middleton's aunt testified that about noon on May 2, 1999, Hinely came searching for Middleton and wanted her to go with him. Finally, Hinely left town as he had warned Middleton she must do.

The evidence was sufficient to enable a rational trier of fact to find Hinely guilty beyond a reasonable doubt of the felony murder of Eugene Ashley. *Jackson*, supra.

2. Hinely contends that, in several respects, he was not afforded effective assistance of counsel. In order to prevail on this claim, Hinely must show both that counsel's performance was deficient and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of this test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the circumstances of the case. *Smith*, supra at 784. The second prong requires that Hinely show that there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different. *Smith*, supra at 783.

(a) Prior to trial, the State offered to allow Hinely to plead guilty to malice murder in exchange for a recommendation of life in prison, with the possibility of parole. Hinely contends that this offer was not properly communicated to him, but he testified at the hearing on his motion for new trial that he received the offer and was adamant in rejecting it as he claimed that he did not commit the crime. A hearing to address the plea was held a few days after the offer was made, and recessed for 52 minutes while Hinely spoke with his two attorneys about the offer; he had also spoken with counsel previously about it. After the recess, Hinely responded to the court's inquiry about the plea by stating that he did not wish to accept the offer. There is no

evidence suggesting that Hinely would have accepted the offer if it had been communicated in some different manner, and Hinely fails to show any prejudice from the alleged error. Id.

(b) Hinely contends that counsel was not adequately prepared for the guilt-innocence phase of the trial, but again fails to show any prejudice from counsel's alleged errors. The court approved funds for a psychiatrist or psychologist to examine Hinely, but counsel did not arrange any examination. Hinely has not shown that any examination would have revealed evidence that might have altered the result of his trial. Similarly, although Hinely contends that counsel did not fully pursue various pretrial motions and failed to discuss the Unified Appeal Procedure with him,[2] he has not shown how avoiding such omissions would have affected the outcome of his trial. Id.

(c) Hinely urges that counsel was ineffective for not impeaching Middleton with a certified copy of her conviction for forgery, a crime of moral turpitude. See *Sapp v. State*, 271 Ga. 446, 448 (2) (520 SE2d 462) (1999); *Hall v. State*, 180 Ga. App. 210, 213 (348 SE2d 736) (1986). First, the court refused to allow Hinely to introduce the record he proffered at trial because he did not attempt to do so until the evidence had been closed. But the record he proffered was a certified copy of an indictment and motion for nolle prosequi of the charges. Neither at trial nor at the hearing on the motion for new trial did Hinely show that Middleton had actually been convicted of forgery, or that competent, admissible evidence of such a conviction existed. Second, even if counsel should have found and used such evidence to impeach Middleton, Hinely was not prejudiced by the omission. Middleton testified that she had been released from a five-month incarceration only a few weeks before Ashley's death. She also testified that she smoked crack cocaine, performed oral sex on Ashley in exchange for money, and pled guilty to his murder. Under such circumstances, "the jury was already fully aware of the disreputable character of [Middleton] by virtue of [her] own testimony on the stand. Accordingly, no reasonable probability exists that, but for this error on trial counsel's part, the result of the proceeding would have been any different. [Cit.]" *Ross v. State*, 231 Ga. App. 793, 798 (6) (499 SE2d 642) (1998).

(d) During direct testimony at trial, the State asked Hinely's stepfather when he had given Hinely the white pickup truck, and he responded: "After he got out of Claxton." The court had the jury removed from the courtroom and discussed with counsel the possibility that the jury recognized this as a reference to the Claxton Deten-

---

[2] Counsel testified at the hearing on the motion for new trial that he had, in fact, discussed the Unified Appeal Procedure with Hinely on several occasions.

tion Center, from which Hinely had been released a few weeks before the killing. During its inquiry, the court determined that the State had not instructed Hinely's stepfather to answer the question in that manner, and that the answer was not directly responsive to the question. The court offered to give a curative instruction, which Hinely's counsel declined, expressing the belief that a curative instruction might actually give undue emphasis to a comment that the jury might have understood as simply a reference to Hinely's leaving the town of Claxton. First, counsel's decision on this matter is one of reasonable trial strategy, and "substantial latitude" is given to the trial court's review of such decisions. *Rivers v. State*, 271 Ga. 115, 118 (2) (b) (516 SE2d 525) (1999). Second, even if counsel's failure to request a mistrial were deemed deficient, no mistrial would have to be granted as "[a] nonresponsive answer that impacts negatively on a defendant's character does not improperly place the defendant's character in issue." *Hansley v. State*, 267 Ga. 48, 49 (3) (472 SE2d 305) (1996). See also *Williams v. State*, 269 Ga. 827, 829 (5) (504 SE2d 441) (1998).

(e) Counsel did not request that the court instruct the jury on the law concerning impeachment by conviction of a crime of moral turpitude. This was not ineffective assistance of counsel as no such issue was placed before the jury, nor is there any evidence that it could have been. See Division 2 (d), supra. Counsel also did not request that the court instruct the jury on the legal principle that the evidence put forth by an accomplice must be corroborated to support a conviction. See OCGA § 24-4-8. However, such corroboration need only be slight, *Klinect*, supra, and there was considerable evidence corroborating Middleton's testimony. See Division 1, supra. Accordingly, we do not conclude that there is a reasonable probability that the outcome of the trial would have been different had the charge been requested. *Smith*, supra at 783. See also *Columbus v. State*, 270 Ga. 658, 663 (2) (d) (513 SE2d 498) (1999).

(f) Hinely contends that counsel was unprepared for the sentencing phase of the trial because counsel had not thoroughly investigated mitigation evidence. Although lead counsel did testify at the hearing on the motion for new trial that he was not prepared for mitigation, counsel was aware of Hinely's prior drug use and family circumstances, and was prepared to call Hinely's relatives, a chaplain from the jail where Hinely was incarcerated, and Hinely himself. Hinely presents nothing to indicate that mitigation evidence other than that already known to counsel existed, or that any such evidence could not have been presented by the witnesses counsel was prepared to call. Therefore, despite lead counsel's statement that he was unprepared for mitigation, Hinely has failed to satisfy the second prong of his burden; he has not shown that, had counsel pre-

pared further for the sentencing phase of the trial, any additional mitigation evidence would have been disclosed that might have altered the outcome of his trial. See *Smith,* supra at 783.

3. Hinely complains that prior to trial, there were times at which he was not represented by two attorneys, as required under Unified Appeal Procedure Rule II (A) (1) (2002), when a defendant is facing the death penalty. But Hinely was not sentenced to death. See *Jackson v. State,* 270 Ga. 494, 499 (11) (512 SE2d 241) (1999). Pretermitting whether any issue of the Unified Appeal Procedure is now moot, Hinely fails to show any specific harm from the violation. Rather he asserts broadly that if two attorneys were present at these hearings, issues would have been raised and errors minimized; without specification of what those issues or errors may be, this Court cannot determine whether the failure to have a second attorney at any particular juncture was harmful. See *Thomason v. State,* 268 Ga. 298, 307 (4) (486 SE2d 861) (1997).

4. Hinely contends that three jurors should have been excused because of their views on the death penalty. See *Greene v. State,* 268 Ga. 47 (485 SE2d 741) (1997). See also *Wainwright v. Witt,* 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985); *Witherspoon v. Illinois,* 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). However, such juror disqualification in regard to the death penalty provides no basis for reversal for a defendant who receives a sentence of life in prison without parole. *Beasley v. State,* 269 Ga. 620, 625 (13) (502 SE2d 235) (1998); *Turner v. State,* 268 Ga. 213, 217 (5) (486 SE2d 839) (1997).

5. After the jury returned guilty verdicts on the two counts of felony murder, Hinely agreed to accept a sentence of life without the possibility of parole. The court then conducted an inquiry akin to that conducted when accepting a guilty plea, so as to satisfy *Boykin v. Alabama,* 395 U. S. 238 (89 SC 1709, 23 LE2d 274) (1969). Hinely stated under oath that, among other things: he understood the situation and the procedure and rights he was waiving by agreeing to the sentence; he was satisfied with the representation of his attorneys; he could think clearly; he was not coerced into agreeing to the sentence; and his decision was freely and voluntarily made. He now contends that his agreement to accept a life sentence without the possibility of parole was not freely and voluntarily given, but was coerced because counsel was unprepared for the sentencing phase. However, as discussed in Division 2 (f), supra, Hinely has not shown that counsel were inadequately prepared for the sentencing phase. Further, the prospect of a greater sentence is not coercion that prevents the decision to plead guilty, or to accept a certain lesser sentence, from being free and voluntary. *Shakur v. State,* 239 Ga. 548, 549-550 (238 SE2d 85) (1977).

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 25, 2002.

*Darden, Burns & Burns, Richard M. Darden, Jennifer R. Burns,* for appellant.

*J. Thomas Durden, Jr., District Attorney, Lewis M. Groover, Jr., Assistant District Attorney, Thurbert E. Baker, Attorney General, Jill M. Zubler, Assistant Attorney General,* for appellee.