A03A0863. ANDERSON v. THE STATE.
A03A1201. FOSTER v. THE STATE.
(582 SE2d 575)

BLACKBURN, Presiding Judge.

In these related cases regarding a consolidated trial of four robbery conspirators,[1] George Rogers Anderson, Jr. and Michael Clay Foster, Jr. appeal their convictions by a jury for armed robbery, bur-

---

[14] Id.

[1] The co-defendants were George Rogers Anderson, Jr., Michael Clay Foster, Jr., Shawn Jerome Knott, and James Anthony Moses II. Chris Foster, Kenny Mitchell, Chris Hancock, and Shahkie Knott, four others who were involved in the crime, were tried separately.

glary, kidnapping, false imprisonment, and possession of a firearm during commission of a crime. Anderson also appeals his conviction for possession of a firearm by a convicted felon. Both appellants contend that (1) the evidence was insufficient to support the verdict; (2) their trials should have been severed; and (3) the trial court erred by admitting certain similar transaction evidence. Separately, Anderson contends that the trial court erred by: (4) admitting an in-court identification and (5) considering his Missouri conviction for armed robbery during sentencing. Also separately, Michael Foster contends that the trial court erred by: (6) instructing the jury on the precepts of conspiracy and party to a crime and (7) admitting testimony from certain witnesses pursuant to the conspiracy exception to the hearsay rule. See OCGA § 24-3-5. For the reasons set forth below, we affirm in both of these related cases.

1. Both Anderson and Michael Foster contend that the evidence was insufficient to support the verdicts against them. We disagree.

> On appeal the evidence is viewed in the light most favorable to support the verdict, and defendants no longer enjoy a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. The standard for reviewing a challenge to the sufficiency of the evidence, whether enumerated as error on appeal or made in the form of a motion for directed verdict of acquittal at trial, is whether under the rule of *Jackson v. Virginia*,[2] the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense.

*Young v. State*.[3]

Viewed in this light, the record shows that, on the evening of December 28, 2000, Shawn Knott informed Chris Foster that he was planning to rob the home of Bobby and Becky Townsend. Kenny Mitchell, James Anthony Moses II, Michael Foster, and Anderson were in hearing range of this conversation and agreed to participate. Chris Foster then told Mitchell that they were planning to steal approximately $150,000 from a safe at the Townsends' home. After discussing the robbery, the participants drove to the Townsends' home in two cars: Knott drove a gold Cadillac containing Anderson, Michael Foster, and Mitchell, and Moses drove his pickup truck.

At approximately 10:15 p.m., Knott, Michael Foster, and Ander-

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[3] *Young v. State*, 242 Ga. App. 681 (1) (530 SE2d 758) (2000).

son, who was brandishing a shotgun, forced their way into the Townsends' home, while Mitchell and Moses remained outside. During the robbery, Moses and Knott communicated by walkie talkie. Anderson pointed the shotgun in Bobby Townsend's face and told him that they wanted his money. The robbers also demanded to see the safe. Bobby Townsend observed that the robbers were wearing black coats and hats obscuring their faces. After the robbers took approximately $3,500 from Bobby Townsend's pockets and examined a small safe in the house, one of the robbers stated: "That's not the safe we're looking for. We want the big safe in the shop."

At that point, Becky Townsend, who had earlier gone to bed, entered the room, and one of the robbers bound her arms with duct tape and forced her to lie on the floor. During this time, Becky had the opportunity to notice that the robbers were wearing black coats. One of the robbers' coats felt like leather to her when she punched the robber.

After Becky had been bound, the robbers escorted Bobby out of his house and forced him to walk toward his shop where the main safe was located. The robbers knew of this location because Chris Foster, who previously worked for the Townsends, had told them about it at an earlier meeting. At this time, Mitchell joined Anderson, Knott, and Michael Foster, while Moses stayed in his pickup truck. At one point, Moses told the others, via walkie talkie: "You're going to the wrong shop. It's not the right shop. Go to the shop in the back."

While the robbers were walking to the shop, Becky managed to free herself from the duct tape that had been used to tie her hands. When she stood up, she discovered that her home had been ransacked and approximately $1,100 had been stolen from her purse. Once she located her car keys, Becky got into her car and drove to her son's nearby home for help. As she drove, she noticed Moses's truck sitting on her property. She described the truck as being similar to her own but having a different floorbed and flared fender wells. As she left her property, Becky blew the horn of her car constantly.

Hearing Becky's horn, the robbers got scared and fled before they could make Bobby open his safe. The robbers, however, pushed Mitchell to the ground and left him behind. Mitchell then threw the dark sweater he had been wearing during the robbery into the woods and began walking along a public road. Concerned that Mitchell was insufficiently dressed for such a cold night, a police officer stopped Mitchell, who claimed he was having car trouble, and the police officer gave him a ride to a gas station.

At the gas station, Mitchell tried to call Chris Foster at the home of his girlfriend, Alicia Ogletree. Chris Foster was not there, but Ogletree connected them using a conference call function on her phone. Mitchell then informed Chris Foster that the plan had gone

sour and that Knott, Moses, Anderson, and Michael Foster had abandoned him at the scene.

Norma Dukes, Anderson's girlfriend, testified that, sometime in the middle of the night following the robbery, Anderson received a phone call from Knott. During the conversation, Anderson became very upset, and Dukes overheard him saying: "Why did you leave him? That's F'd up."

When police officers reported to the Townsends' home, their investigation indicated that the robbers must have had inside information about the workings of their business and the location of their safe. As such, the police officers requested a list of recent employees and decided to visit the homes of three people who had been listed, including Chris Foster. On the way to Chris Foster's home, the police were told that Chris Foster and Mitchell had been stopped on Highway 108 approximately two hours after the commission of the robbery. Both Mitchell and Chris Foster were arrested, and they confessed their involvement. They also identified Moses, Anderson, Knott, and Michael Foster as the other robbery conspirators.

On the afternoon of December 29, 2000, Ogletree, Chris Foster's girlfriend, called police and reported that she had received a number of phone calls from Mitchell the prior night. Mitchell wanted to speak to Chris Foster, so she connected them. During this phone conversation, Ogletree heard Mitchell implicate Anderson, Knott, Moses, and Michael Foster.[4]

The remaining robbers were arrested shortly thereafter. After being told that he was being arrested for the "armed robbery of an elderly couple in Waleska," and asked whether he knew anything about the crime, Anderson replied: "Sir, if that man can identify me, I guess I'll go to jail. If he can't, I guess I won't."

On January 2, 2001, the shotgun that had been used in the robbery was found on the side of the road. The ownership of the gun was traced to Michael Lindsey, from whose home the gun had been stolen on December 1, 2000. At trial, Lindsey testified regarding this burglary which was admitted as a similar transaction against Anderson and Moses, whom Lindsey identified at trial as two of four robbers who invaded his home.

Also during the trial, Bobby Townsend identified the shotgun as the one used during the robbery of his home. He also identified a mesh headpiece found in Anderson's hotel room as the one that the robber brandishing the shotgun had been wearing at the time of the robbery. Becky Townsend testified that a black leather coat and gloves taken from Anderson were consistent with what she

---

[4] At trial, Ogletree denied that she made this phone call.

remembered one of her assailants wearing. She also identified a photograph of Moses's pickup truck as the one she had seen on her property during the robbery.

This evidence was sufficient to support the verdict against both Anderson and Michael Foster. *Jackson v. Virginia*, supra. And, both defendants' arguments that Mitchell's testimony was not sufficiently corroborated by other evidence must fail. See OCGA § 24-4-8.

> [T]he corroborating evidence connecting a defendant to a crime may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that the defendant participated in the crime. Whether the corroborating evidence is sufficient is a matter for the jury, and even slight evidence of corroboration connecting an accused to a crime is legally sufficient.

(Citation omitted.) *Hinely v. State*.[5]

2. Both Anderson and Michael Foster contend that the trial court erred by denying their motions to sever their trials. A trial court's decision not to sever will be affirmed absent an abuse of discretion. *Short v. State*.[6] "In a non-death penalty case, the defendant requesting a severance has the burden of making a clear showing of prejudice and a denial of due process in the absence of severance." (Punctuation omitted.) *Sharpe v. State*;[7] accord *Owen v. State*.[8]

> The factors a trial court must consider in exercising its discretion in regard to a motion to sever are (1) whether the number of defendants will create confusion as to the evidence and the law applicable to each, (2) whether there is a danger that evidence admissible against one defendant will be considered against the other despite the court's instructions, or whether the strength of the evidence against one defendant will engulf the other with a "spillover" effect, and (3) whether the defendants' defenses are antagonistic to each other or to each other's rights.

*Stephens v. State*.[9] "The mere fact that codefendants' defenses are antagonistic is not sufficient in itself to warrant the grant of a sepa-

[5] *Hinely v. State*, 275 Ga. 777, 779 (1) (573 SE2d 66) (2002).
[6] *Short v. State*, 256 Ga. 165, 168 (4) (345 SE2d 340) (1986).
[7] *Sharpe v. State*, 272 Ga. 684, 686 (2) (531 SE2d 84) (2000).
[8] *Owen v. State*, 266 Ga. 312, 314 (2) (467 SE2d 325) (1996).
[9] *Stephens v. State*, 245 Ga. App. 823, 827 (8) (538 SE2d 882) (2000).

rate trial absent a showing of harm." *Holmes v. State*.[10] "The burden is on the defendant requesting a severance of trials to make a clear showing of prejudice and denial of due process." *Stephens*, supra.

Neither Anderson nor Michael Foster has made this showing. The record reveals that the trial court carefully considered whether the number of defendants would confuse the jury and actively took steps to prevent any such confusion. In addition, the evidence against both Anderson and Michael Foster was not disproportional to that against their fellow co-defendants. And, finally, the co-defendants' defenses in this case were not so antagonistic as to affect each other's rights. The trial court did not err.

3. Both Anderson and Michael Foster contend that the trial court erred in its handling of similar transaction evidence concerning an earlier robbery of Lindsey. Anderson contends that the trial court erred by admitting the similar transaction into evidence, and Michael Foster contends that the trial court erred by failing to instruct the jury that the similar transaction evidence could not be used against him. Both of these contentions fail.

At trial, Lindsey testified that, on the evening of December 1, 2000, two men who were claiming to be drug enforcement agents forced their way into his home. The men then tied Lindsey up with plastic ties, and two more men in masks entered the house. The robbers demanded drugs, money, and guns, and they stole Lindsey's shotgun, which both Lindsey and Bobby Townsend identified at trial. In addition, Lindsey positively identified Anderson and Moses at trial as the first two robbers who entered his home.

As an initial matter, the trial court did not err by admitting evidence of this similar transaction against Anderson and Moses. "A trial court's determination that similar transaction evidence is admissible will not be disturbed absent an abuse of discretion." (Punctuation omitted.) *Livery v. State*.[11] Before similar transaction evidence may be admitted, the State must satisfy a three-prong showing.

> First, the State must demonstrate that it seeks to introduce such evidence for an appropriate purpose, such as illustrating appellant's identity, intent, course of conduct and bent of mind; second, the State must show sufficient evidence to establish that the accused committed the independent offense or act; and third, the State must demonstrate a sufficient connection [or] similarity between the independent

---

[10] *Holmes v. State*, 272 Ga. 517, 518 (2) (529 SE2d 879) (2000).
[11] *Livery v. State*, 233 Ga. App. 332, 334 (1) (a) (503 SE2d 914) (1998).

offense or act and the crime charged so that proof of the former tends to prove the latter.

*Dunbar v. State.*[12] "The proper focus is on the similarity, not the differences, between the separate crime[ ] and the crime in question." *Wayne v. State.*[13]

In this case, the similar transaction evidence was: (1) admitted for the proper purpose of showing identity; (2) sufficiently linked to both Anderson and Moses; and (3) sufficiently similar to the robbery of the Townsends. Thus, the trial court did not abuse its discretion by admitting this similar transaction evidence.

Michael Foster contends, nonetheless, that the trial court erred by failing to give the jury a limiting instruction admonishing them that the similar transaction evidence could be considered only in determining the guilt of Anderson and Moses. The record, however, shows that, immediately before the similar transaction testimony, the trial court instructed the jury: "Any Defendant who is not so positively connected or identified to this extraneous or other transaction — you may not consider the evidence as to such Defendant not so positively identified." Then, in its concluding charge to the jury, the trial court charged: "[Y]ou may not consider any such evidence as to Defendants Michael Foster and Shawn Knott. In doing so, the Court expresses no opinion as to any other Defendants, but merely finds as a matter of law that there is no identification as to the Defendants Foster and Knott." This instruction was sufficient to ensure that the similar transaction evidence of the Lindsey burglary was not improperly considered by the jury to implicate Michael Foster.

4. Anderson contends that the trial court erred by allowing Lindsey to identify him in court, arguing that Lindsey had not been able to identify him in photographic lineups he had previously seen.

In *Quijano v. State*,[14] a witness had been unable to identify the defendant from an allegedly unduly suggestive pre-trial photographic lineup. The witness did, however, positively identify the defendant in court based on her observation of the defendant at the time the crime was committed. On these facts, our Supreme Court held:

The failure of [the witness] to make a pre-trial identification would not require the trial court to strike [his] in-court identification of [the defendant] as the man [he] saw. Because [the victim] had ample opportunity to observe the perpetra-

---

[12] *Dunbar v. State*, 228 Ga. App. 104, 107-108 (2) (491 SE2d 166) (1997).
[13] *Wayne v. State*, 269 Ga. 36, 39 (3) (495 SE2d 34) (1998).
[14] *Quijano v. State*, 271 Ga. 181 (516 SE2d 81) (1999).

tor and the allegedly suggestive pre-trial photo lineup did not affect [his] testimony, the trial court properly allowed [his] in-court identification.

(Citation omitted.) Id. at 183 (3).

Here, Lindsey testified that, at one point during the robbery of his home, he looked straight at Anderson's face, just before Anderson struck him in the back of his head. As such, the trial court did not err in allowing Lindsey to identify Anderson at trial. *Quijano*, supra.

5. Anderson contends that, during his sentencing, the trial court erred by considering his Missouri conviction for armed robbery pursuant to the Georgia statute on recidivist sentencing, OCGA § 17-10-7. Specifically, Anderson contends that the State failed to show that his Missouri conviction was based on criminal activity which would be considered a felony in Georgia. This enumeration lacks merit.

At the sentencing hearing, the State introduced a certified copy of Anderson's Missouri conviction for first degree robbery, armed criminal action, kidnapping, and tampering in the first degree. The nature of Anderson's offense was described in informations attached to the convictions: Anderson, while using a deadly weapon, stole money from a Missouri man, kidnapped him, and operated the man's car without permission. Although the language in the convictions may not track

> Georgia's armed robbery statute, the [Missouri conviction's] language describes that defendant was in possession of a [deadly weapon] when he forcefully and violently took valuables from [the victim]. This is sufficient to prove that defendant was convicted of [an offense in Missouri] which would have . . . been the serious violent felony of armed robbery had [it occurred] in Georgia. OCGA § 17-10-7 (b) (2).

*Smith v. State*.[15] See also OCGA § 16-8-41 (a). Accordingly, the trial court did not err by considering the Missouri conviction.

6. In his separate appeal, Michael Foster contends that, because the State failed to prove the existence of a conspiracy, the trial court erred by instructing the jury on the precepts of conspiracy and party to a crime. Specifically, Michael Foster argues that the evidence, at best, would support only a finding that he was an accessory after the fact. The evidence, however, as more fully discussed above, showed Michael Foster's presence before, during, and after the crime as an active participant. Moreover, the evidence, viewed in the light most favorable to the verdict, supports a finding that Anderson, Michael

---

[15] *Smith v. State*, 241 Ga. App. 770, 771 (1) (527 SE2d 608) (2000).

Foster, and the others conspired to rob the Townsends. This enumeration, therefore, lacks merit.

7. Finally, Michael Foster contends that the trial court erred by admitting certain statements incriminating him under the co-conspirator exception to the hearsay rule, again arguing that the State failed to show the existence of a conspiracy. See OCGA § 16-4-8. As we have previously determined that there was sufficient evidence of a conspiracy, this enumeration lacks merit.

*Judgments affirmed. Ellington and Phipps, JJ., concur.*

DECIDED JUNE 3, 2003 —

*Louis M. Turchiarelli,* for appellant (case no. A03A0863).

*Gregory A. Hicks, James K. Luttrell,* for appellant (case no. A03A1201).

*Garry T. Moss, District Attorney, Rosemary Kittrell, Assistant District Attorney,* for appellee.