FINAL COPY
309 Ga. 566

S20A1021.  CLARK v. THE STATE.

WARREN, Justice.

A jury convicted Jennifer Clark of malice murder and other

crimes in connection with the death of Donald Clark.[1]  On appeal,

Clark contends that her trial counsel rendered constitutionally

---

[1] The crimes occurred on the morning of November 18, 2008.  A Lamar County grand jury indicted Jennifer Clark and Michael Yost for malice murder, felony murder predicated on aggravated assault, five counts of aggravated assault, one count of aggravated battery, one count of concealing the death of another, and one count of tampering with evidence.  Clark alone was also indicted on two counts of cruelty to children in the first degree.  The State nolle prossed the aggravated battery count and four of the aggravated assault counts.  Yost entered a negotiated plea of guilty to malice murder, concealing the death of another, and tampering with evidence in exchange for a promise to testify truthfully at Clark's trial.  Clark was tried from January 31 to February 4, 2011, and a jury found her guilty of all counts.  The trial court sentenced Clark to life in prison for malice murder, ten years consecutive for concealing the death of another, ten years consecutive for tampering with evidence, and twenty years consecutive for the two counts of cruelty to children in the first degree.  The remaining counts were merged for sentencing purposes or vacated by operation of law. On March 15, 2012, Clark filed a motion for an out-of-time appeal through new counsel, which the trial court granted.  Clark later filed a second motion for an out-of-time appeal, which the trial court also granted.  On May 29, 2012, Clark filed a motion for a new trial, which she later amended.  After a hearing, the trial court denied the motion for a new trial, as amended, on February 7, 2020.  Clark timely filed a notice of appeal on February 18, 2020, and the case was docketed in this Court for the April 2020 term and submitted for a decision on the briefs.

ineffective assistance by failing to request that the jury be instructed that it could consider Michael Yost's felony convictions in assessing his credibility. Because Clark has failed to demonstrate that she was prejudiced by her trial counsel's alleged deficient performance, we affirm.

1.     Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. Jennifer Clark was married to Donald, and they had two young sons, ages eight and ten. During the course of the Clarks's marriage, which ended in divorce four months before Donald's murder, Jennifer had at least four extramarital affairs. At the time of Donald's murder, Clark's most recent affair was with Yost, who was the son of Donald's best friend.

In January or February 2008, Yost was having difficulty getting along with his father and stepmother, so the Clarks allowed Yost—whose affair with Clark was unknown to Donald—to move in with them. Yost and Clark continued their affair without Donald's knowledge. On March 7, Donald called 911 in the middle of the

night when he woke up to find Clark looming over him with an aluminum baseball bat. Clark told the responding officer that Donald did not provoke her and she had no reason for her actions. Nonetheless, Donald told officers that he did not want Clark to be arrested. Sometime after this incident, Clark told Donald's sister, Brenda Maddox, that Clark had held the bat over Donald to see "if she could go through [with] it."

The day after the baseball-bat incident, Clark and Donald agreed to get divorced and went to the courthouse to initiate the process. Later that day, Donald confronted Yost about Donald's suspicions that Yost and Clark were having an affair, and Yost quickly admitted to it. Donald made Yost move out of the house, and Clark left to live with Yost at his grandmother's house. Around the same time, Clark discovered she was pregnant with a child whose father she later determined was Yost.

After Clark moved out of the house, Donald hired Danielle Young to move in and help him take care of the children. Young agreed and moved in with her two children. In early May 2008,

Clark came to Donald's house unannounced and discovered Young living there. Clark began screaming, cursing, and throwing things around the house in front of her children and Young's children. Clark also grabbed an aluminum bat that was kept in the house and threatened Donald. Clark would later complain to Yost about Donald and on multiple occasions made comments to Yost about "[g]etting rid" of Donald and asked Yost "stuff like" "[i]f [Clark] led [Donald] out in the road, would [Yost] run him over."

The Clarks's divorce was finalized in July 2008. Donald retained sole custody of their minor sons and became the sole owner of the house. In September 2008, Clark and Yost began living with Maddox. While Clark was living at Maddox's house, Donald would visit Clark with their children two to three times a week and repeatedly asked Clark to move back in with him, but she always refused. In October 2008, Clark asked Donald if she could come back home, and Donald agreed. The night before Clark returned to Donald's home, she asked Yost to help her hatch a plan to "get rid" of Donald. Yost responded by calling Clark "crazy," and Clark did

not pursue the conversation any further.  After Clark's return to Donald's home, however, she reached out to Yost and informed him that she wanted to leave Donald again.

In the early morning hours of November 18, 2008, Clark attacked Donald by bludgeoning him multiple times with an aluminum baseball bat as he slept.  Yost was also present, and the children were asleep in the home.  Clark then convinced Yost to help her move and dispose of Donald's body before she cleaned up and attempted to mislead Donald's family and friends about his whereabouts.

At trial, Yost testified to the following.  On November 17, Clark instructed Yost to come to the Clarks's house very early the next morning, telling him that she would be ready with some clothes packed.  Clark called him later that same day to instruct him to wait for her to signal with the back porch light to indicate when it was safe for Yost to come to the door.  Yost went to the house as directed on November 18 and waited for the porch light signal from Clark. When Yost entered the house, he saw Clark retrieve the aluminum

baseball bat and proceed to hit Donald in the head with it several times while he slept. Donald began making gurgling sounds as a result of the trauma. Clark said Yost either had to help dispose of Donald's body or risk losing their unborn child. Yost argued with Clark, but eventually agreed to help her.

Yost admitted that, after the beating, he tied two plastic bags around Donald's head. He and Clark rolled Donald's body in the bed linens and placed Donald in the trunk of Donald's own car along with his wallet, work boots, and the aluminum bat. Clark gave Yost the keys to Donald's car and Donald's cell phone. She instructed Yost to get rid of the items, the body, and the car, and to make it appear like Donald merely left home. Yost did not clean anything in the house before leaving in Donald's car.

Yost drove to a field, dragged Donald's body into the woods, and covered it with a camouflage blanket. He also disposed of Donald's wallet and work boots and the aluminum bat. Yost parked Donald's car at a motel in Forsyth, Georgia, and waited for Clark to contact him. Clark sent a text to Donald's phone stating that the children

were on the school bus, and Yost, who was carrying the phone, responded with "K." Clark then picked up Yost and tossed Donald's cell phone out of the car window. Clark had already cleaned the bloodied bedroom before they returned to Donald's house.

During Yost's trial testimony, he acknowledged that he had pleaded guilty to murder, concealing the death of another, and tampering with evidence, and that part of his plea deal was to testify at Clark's trial. Yost also testified about several untruthful statements he had previously made to law enforcement officers during their investigation of the crimes. On cross-examination, he admitted to having two previous burglary convictions as well.

Maddox, Donald's sister, testified that Donald had a habit of calling her daily and she therefore became concerned when neither she nor the family had heard from Donald for two days. When Maddox called Clark and questioned her about Donald's whereabouts, Clark told Maddox that Donald appeared to have left during the night while Clark was asleep with their sons in an adjacent room and stated that Donald was "probably off with one of

his whores." When Maddox questioned her further, Clark informed Maddox that she tried calling Donald but when she did not hear from him, she sent the children to school and went about her day cleaning the house. Maddox expressed concern because it was highly uncharacteristic of Donald to leave his children. Maddox called the Sheriff's Office and reported Donald's absence, handed out flyers, talked to the local newspaper, and "talked to everybody [she] could think of to talk to" about where Donald may be. One of Donald's co-workers testified that on the day of Donald's murder, he received a phone call from Clark relaying specific details about the prior evening and suggesting that Donald might have run off with Young, his former roommate. He stated that Clark had never called him before and "[i]t just felt weird to me." The Clarks's two children also testified at trial, including about Clark's actions toward them related to Donald's disappearance and death and the mental and emotional trauma they suffered as a result.

After Donald's disappearance, crime scene investigators discovered the presence of Donald's blood and cleaning chemicals in

Donald's home. In late December 2008, over a month after the murder, Lamar County Sheriff Joe Buice found Donald's body, as well as Donald's wallet, his work boots, and the aluminum bat. Donald's body was in a state of "advanced decomposition." Donald's car was later located at a motel near the interstate. The GBI medical examiner testified that Donald's death could have resulted from either blunt force trauma to the head or from asphyxia as a result of the plastic bags being tied over his head.

At trial, Clark testified in her own defense. She denied inviting Yost to the house on the morning of the murder. Contrary to Yost's testimony, Clark testified that on the morning of Donald's murder she was awakened by a "loud crack" and then saw Yost standing by the side of the bed wearing a ski mask and holding an aluminum bat. Clark recalled being so pregnant at the time that she could not sit up "without taking ten or fifteen minutes." Clark told the jury that Yost began taunting and threatening her and the safety of her children if she told anyone about what Yost had done or if she did not do what he said. She said that Yost told her he was sparing her

life because she was pregnant with his child. Clark testified that she did not help Yost murder Donald or dispose of Donald's body. She insisted that Yost acted alone. Clark explained that Yost gave her instructions on what to do and what to say after the murder. Clark admitted to picking up Yost the morning after the murder but said she did so because it was "part of what [she] was supposed to do." Clark testified that she did not have any feelings for Yost. However, the State presented evidence that when Clark was arrested, she was dressed up to spend Christmas Eve with Yost and was carrying an "I heart Michael" keychain.

Clark does not contest the legal sufficiency of the evidence supporting her convictions. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Clark guilty beyond a reasonable

doubt of the crimes for which she was convicted.[2]  See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2.     In her sole enumeration of error, Clark contends that her trial counsel was constitutionally ineffective by failing to request that the jury be instructed that, in assessing Yost's credibility, the jury could consider his convictions for murder, tampering with evidence, and concealing the death of another—all related to Donald's murder—and two previous convictions for burglary, which were admitted through trial testimony without objection. Specifically, Clark contends that her trial counsel should have requested that the jury receive the following pattern instruction, tailored to the facts of her case:

> In determining the credibility of [Michael Yost] and any testimony by [him] in court, you may consider . . . evidence offered to attack, cast doubt upon, and challenge [his] credibility or cause you to disbelieve [Yost].  This would include evidence of: [p]roof that [Yost] has been convicted of the offense[s] of [murder, burglary,

---

[2] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020.  See *Davenport v. State*, ___ Ga. ___ (___ SE2d ___) (2020).  The Court began assigning cases to the December Term on August 3, 2020.

concealing the death of another, and tampering with evidence].

See Suggested Pattern Jury Instruction, Vol. II: Criminal Cases, § 1.31.40 (4th ed.); former OCGA § 24-9-84.1 (regarding use of criminal convictions to attack credibility of witness). Clark argues that she was prejudiced by trial counsel's failure to request this instruction because the State's case turned primarily on Yost's testimony.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466

U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Pretermitting whether trial counsel performed deficiently by failing to request a jury instruction regarding impeachment by prior convictions, Clark has not established a reasonable probability that, in the absence of counsel's alleged deficiency, the result of Clark's trial would have been different. Clark therefore fails to meet her burden of demonstrating prejudice, and her claim of constitutional ineffectiveness fails.

Specifically, Yost acknowledged during his direct examination that he had pleaded guilty to murder based on his participation in

Donald's murder. On cross-examination, Clark's trial counsel further questioned Yost about his murder conviction, elicited additional testimony from Yost about his guilty pleas to concealing the death of another and tampering with evidence in relation to Donald's murder, and elicited information about Yost's prior unrelated felony convictions for burglary and other crimes. Clark's trial counsel also questioned Yost extensively about multiple prior inconsistent statements that Yost had made to police during their investigation of Donald's murder, which resulted in Yost repeatedly admitting that he "told a lot of lies to the police." And in her closing argument, Clark's trial counsel attacked Yost's credibility, including because he was a convicted felon, calling him a "[t]rained liar" with "[m]ultiple convictions."

The trial court charged the jury generally on credibility and impeachment of witnesses, and specifically that "[i]n assessing the credibility of a witness, you may consider any possible motive in testifying, if shown. . . . [Y]ou are authorized to consider any possible pending prosecutions, negotiated pleas, grants of immunity or

leniency, or similar matters," and that "[a] witness may be impeached by one of the following: disproving facts to which the witness testifies, proof of reputation for untruthfulness, proof of contradictory statements previously made by the witness about matters relevant to the witness's testimony and to the case." These charges included an instruction that "[t]he credit to be given to the balance of the testimony of the witness is for you to determine," "[i]t is for you to determine whether or not a witness has been impeached and to determine the credibility of such witness and the weight the witness's testimony shall receive in the consideration of the case," and "[y]ou alone decide the believability of witnesses." Moreover, the trial court instructed the jury on matters such as the presumption of innocence, the burden of proof, grave suspicion, accomplice corroboration, and coercion.

Clark's case is similar to *Green v. State*, 304 Ga. 385 (818 SE2d 535) (2018), where we held that, even assuming trial counsel was deficient for failing, among other things, to seek a jury instruction on impeachment of a "key State witness" by felony conviction, the

defendant failed to meet his burden of showing that he was prejudiced thereby. Id. at 386. There, in addition to eliciting testimony from the witness about his felony history, defense counsel also impeached the witness by highlighting inconsistencies and other problems in his testimony. Id. at 392. Moreover, the trial court in that case "instructed the jury on impeachment generally[;] . . . impeachment specifically by disproving the facts to which the witness testified or proof of prior contradictory statements"; and that, "in determining the believability of witnesses, it 'may also consider (the witness's) personal credibility insofar as it may have been shown in your presence and by the evidence." Id. at 392-393. We concluded that the jury "was given several reasons to question [the witness's] credibility and instructed on how those factors might properly inform its consideration of the case," and that the defendant "ha[d] not shown that any marginal additional benefit he might have received in having the jury fully instructed on how it might properly consider evidence of [the witness's] prior conviction would have changed the outcome of his trial." Id. at 393.

Here, like in *Green*, the jury "was given several reasons to question" Yost's "credibility and instructed on how those factors might properly inform its consideration of the case." *Green*, 304 Ga. at 393. Also like in *Green*, Clark "has not shown that any marginal additional benefit [s]he might have received in having the jury fully instructed on how it might properly consider evidence of [Yost's] prior conviction[s] would have changed the outcome of [her] trial." Id.; see also *Garland v. State*, 311 Ga. App. 7, 12 (714 SE2d 707) (2011) (concluding that, where a State witness acknowledged that he had reached a negotiated plea deal in connection with his participation in the crimes for which the defendant stood trial and that he had unrelated felony convictions, trial counsel's failure to object to the trial court's refusal to give a jury charge on impeachment by prior felony convictions did not prejudice defendant because "'the jury was already fully aware of the disreputable character of [the witness] by virtue of (his) own testimony on the stand,'" and because the trial court did charge the jury on witness impeachment and credibility, including the consideration of motive

and negotiated plea deals) (quoting *Hinely v. State*, 275 Ga. 777, 781 (573 SE2d 66) (2002)). Accordingly, Clark has not shown a reasonable probability that, but for trial counsel's alleged error, the result of Clark's trial would have been different. Clark's claim that her trial counsel rendered constitutionally ineffective assistance therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.

Murder. Lamar Superior Court. Before Judge Wilson.

*David J. Walker*, for appellant.

*Richard G. Milam, District Attorney, Cynthia T. Adams, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.