311 Ga. 706
FINAL COPY

S21A0395. THOMAS v. THE STATE.

ELLINGTON, Justice.

A jury found Tony Thomas guilty of felony murder in the

shooting death of Dominique Boyer; malice murder in the shooting

deaths of Veondus Dennis and Antwan Wheeler; aggravated assault

against Fredrick Foster, Raheem Zeigler, Kevyn Courtney, and

Tiojah Johnson; and criminal gang activity.[1] On appeal, Thomas

---

[1] The crimes against Boyer and Foster occurred on March 28, 2013; the crimes against Dennis, Wheeler, Zeigler, Courtney, and Johnson occurred on May 10, 2014. A DeKalb County grand jury returned an indictment against Thomas for felony murder of Boyer predicated on aggravated assault (Count 1), malice murder of Dennis and Wheeler (Counts 6 and 10), felony murder against Dennis and Wheeler predicated on aggravated assault (Counts 7 and 11), aggravated assault by shooting from within a motor vehicle in the direction of each victim (Counts 2, 4, 8, 12, 14, 16, and 18), and seven counts of participating in criminal street gang activity through the commission of the charged murders and aggravated assaults (Counts 3, 5, 9, 13, 15, 17, and 19). At a trial that ended on November 18, 2016, a jury found Thomas guilty on all counts. The trial court sentenced Thomas to life in prison on Count 1 and life in prison without parole on Counts 6 and 10 (the three murders), 20 years in prison each on Counts 4, 14, 16, and 18 (aggravated assaults against the four surviving victims), and 15 years in prison each on Counts 3, 5, 9, 13, 15, 17, and 19 (street gang activity), with all sentences to run concurrently. Counts 7 and 11 (felony murder of Dennis and Wheeler) were vacated as a matter of law;

contends that the trial court plainly erred in failing to instruct the jury on impeachment by a prior felony conviction and in denying his motion for a new trial based on the State's failure to disclose evidence that two witnesses had felony convictions. Thomas also contends that he received ineffective assistance of counsel. For the reasons explained below, we affirm.

Pertinent to Thomas's arguments on appeal, the evidence presented at trial showed the following.[2]

*The 2013 Shooting (Boyer and Foster)*

The first incident involved a drive-by shooting on March 28, 2013, at the Austin Oaks apartment complex in DeKalb County. Foster testified that, at that time, he was a member of Blocc, a local street gang. After school that day, Foster, Boyer, and two others

---

Counts 2, 8, and 12 (aggravated assault against Boyer, Dennis, and Wheeler) merged with the respective murder counts. Thomas filed a timely motion for a new trial, which he amended on February 26, 2018. The trial court conducted a hearing on the motion on May 11, 2018, and denied the motion on August 3, 2020. Thomas filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2020 and submitted for a decision on the briefs.

[2] We remind litigants that the Court no longer routinely considers the sufficiency of the evidence sua sponte in non-death penalty cases. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020).

2

were sitting in front of an apartment building waiting for a friend when a car approached. Shots were fired from inside the car as it drove past, and Boyer was shot in the head. Foster testified that he ran for cover when the shooting started and that he did not see who the shooter was or how many people were in the car. Foster testified that at the time of the shooting there was a "beef" between Blocc and the Duct Tape Boyz gang ("DTB"), but he did not know whether the shooting was gang-related.

Demetris Wilson, who was charged along with Thomas with murdering Boyer, testified at Thomas's trial. Wilson testified that "Duct Tape" refers to the gang Duct Tape Boyz and also to the music label, Duct Tape Entertainment, a business that includes many people who are not in the gang. Wilson, who is known as "Peewee," testified that he was not a member of Duct Tape but that he was a member of Runts, a gang that is "associated" with Duct Tape. Wilson testified that, at the time of the shooting, he had a personal dispute with Blocc. He testified that he had stolen a vehicle on the morning of the shooting and gone out that afternoon with Deontay Cosby-

Hendon and three others to find and kill members of Blocc. Wilson testified that he drove and that Cosby-Hendon and his friend, whom Wilson knew only as "D-man," shot at the victims. Wilson testified that he had given Thomas a ride in the stolen car earlier that day but that Thomas was not in the car during the shooting. He testified that he had pleaded guilty to voluntary manslaughter for his role in the shooting of Boyer and had been sentenced to 20 years with 15 to serve in prison.

A detective testified that he and another detective interviewed Wilson in June 2014, and an audio recording of the interview was admitted and played for the jury. During that interview, contrary to his trial testimony, Wilson stated that the shooters were Thomas and Cosby-Hendon. Wilson picked Thomas out of a photo lineup and stated that Thomas was in Duct Tape. An audio recording of a telephone conversation Wilson had with his mother and grandparents a few days before Thomas's trial was also admitted and played for the jury. During that call, Wilson stated that Thomas was going to trial and that he was going to court to testify "to help

[Thomas] get out." His grandmother asked if Thomas was the shooter, and he replied, "yeah, him and [Cosby-Hendon]."

Another witness to the shooting, Marcus Emmett, was called by the State, but he refused to be sworn, refused to state his name, and answered "I don't recall" to each of the State's questions. A detective testified about his interview with Emmett (an audio recording of which was played for the jury), in which Emmett stated that he was near Boyer when the shooting started and saw Wilson driving the car, Thomas shooting from the front passenger seat, and Cosby-Hendon shooting from the back. Emmett also told the detectives that he had seen the same group driving around in the same vehicle before the shooting that day and that they were looking for Foster because of some type of "beef" between Foster and Wilson.

When the police recovered the vehicle Wilson drove during the drive-by shooting, a cell phone case found inside the vehicle had Thomas's fingerprints on it.

*The 2014 Shooting*
*(Johnson, Courtney, Dennis, Wheeler, and Zeigler)*

5

Approximately a year after Boyer was killed, Johnson, Courtney, Dennis, and Wheeler went to South DeKalb Mall to shop. Raheem Zeigler testified that he and Wheeler were members of Blocc and that Wheeler called him from the mall that day and said that he had seen a person there whom Zeigler and Wheeler knew as "Splash," who was a member of the Fenesco City gang. Zeigler went to the mall "to help [Wheeler] out." Wheeler and Zeigler walked around the mall to see what was going on. Zeigler testified that Wheeler received a call from a Fenesco City member whom they knew as "Umba." Wheeler told Zeigler that Umba said he was coming to the mall because he heard Wheeler and Zeigler were there. Umba called again to make sure they were still there. Umba called a third time and said he was waiting for Wheeler and Zeigler behind the mall and that "Tony" was on his way to join them. Zeigler took Wheeler's phone and told Umba to stop calling them, and Umba said that he had been waiting for a long time for Wheeler and Zeigler to be together in one place.

Zeigler testified that, although he and Wheeler were armed, he

persuaded Wheeler not to meet the Fenesco City members to fight because they did not know how many of them would be there. They left the mall with Johnson, Courtney, and Dennis in Johnson's car. Courtney drove, Johnson sat in the front passenger seat, and Dennis, Wheeler, and Zeigler sat in the back. Dennis told Courtney where to turn to get to the house where Zeigler wanted to be dropped off. When they were on Shamrock Drive in DeKalb County, Courtney heard a window shatter and felt something hit her in the back, and she realized she had been shot from a car that was behind them. That car, a white Impala, pulled up close beside Johnson's car. Courtney and Johnson both saw two men, one in the front passenger seat and one in the rear passenger seat, shooting multiple times into Johnson's car, primarily at the passengers in the back seat. Courtney and Johnson saw that one of the guns had an extended clip. Dennis and Wheeler were fatally shot in the head, and Zeigler was shot in the arm. As the Impala sped away, Courtney, Johnson, and Zeigler jumped out of the car. Johnson testified that Zeigler started shooting at the Impala as it drove away. The police were able

7

to determine that one of the firearms used in the attack on the occupants of Johnson's car was an AK-47 rifle.

At trial, Zeigler testified that he did not see who was shooting from the other car and in particular that he did not see Thomas. At other points during his testimony, Zeigler changed his account, admitted that he knew who carried out the shooting, and testified that he did not identify the perpetrators to the police because he planned "to handle it on the street" and avenge the deaths of his friends Wheeler and Dennis by "kill[ing] somebody." He admitted telling detectives that Thomas was one of the shooters, but he testified that he had only identified Thomas because "everybody . . . kept throwing his name in, Tony this, Tony that" and that he identified Thomas as a shooter so that he would be granted bond on an aggravated assault charge that was pending against him. Zeigler also denied ever having seen a lineup or filling out a form identifying Thomas. Zeigler testified that Duct Tape was a record label, although people associated with Duct Tape used hand signs, and that there was "a petty beef" between Blocc and Duct Tape at the

8

time of the shooting that escalated into people getting shot. Zeigler testified that Fenesco City is not Duct Tape, so the shooting on Shamrock Drive did not arise from the "beef" between Blocc and Duct Tape.

A detective testified that he interviewed Zeigler a few days after the shooting. In a photo lineup, Zeigler identified Thomas as one of three people he thought were "involved based on an altercation that took place earlier that day at South DeKalb Mall." About a month after the shooting, the detective interviewed Zeigler again. Zeigler told the detective that during the drive-by shooting he had seen Thomas shooting at him with a "chopper" (slang for an AK-47 rifle). The detective testified that Zeigler picked Thomas out of a photo lineup, and he recorded his identification on a form and wrote "Tony is the one who used the chopper who killed [Wheeler] and [Dennis]." The State played an audio recording of the second interview, when the detective showed Zeigler the lineup and he filled out the form. Zeigler also told the detective that Thomas's Twitter page was "MoneyMakin_Tony."

Shante Wheeler, the sister of victim Antwan Wheeler, testified that there was "a little argument" between Blocc and DTB that escalated into something bigger. Shante was not sure if DTB was a music label or a gang. She testified that, on the day after her brother was killed, Zeigler told her that "he looked up" from where he was sitting in Johnson's car and saw "Tony . . . with a gun and he was shooting" from the other car, that he "looked [Tony] dead in his eye," and that he saw Tony "hanging out the window with the gun and . . . shooting and he killed [Wheeler]." Shante testified that she told Zeigler that she did not know Tony and "that's when he told [her] that Tony was in Duct Tape, DTB." Shante asked Zeigler why he had said nothing to the police, and he responded, "I didn't tell the police because I wanted to kill Tony myself."

An investigator who was qualified as a gang expert testified about a conflict between DTB and Blocc and explained that Fenesco City is a subset of DTB. During the investigator's testimony, the State introduced social media posts by Thomas, and the investigator testified about how the posts connected Thomas to Wilson, Cosby-

Hendon, DTB, and the 2013 and 2014 shootings.

1. Thomas contends that he was denied due process under *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), and *Giglio v. United States*, 405 U. S. 150 (92 SCt 763, 31 LE2d 104) (1972), because the prosecution failed to disclose evidence that Emmett and Zeigler had felony convictions. In addition, Thomas contends that he received constitutionally ineffective assistance of counsel, based on his trial counsel's failure to investigate the criminal histories of the witnesses and discover Emmett's and Zeigler's convicted-felon status. Thomas argues that he was prejudiced by the purported *Brady-Giglio* violation, and by counsel's failure to impeach Emmett and Zeigler with evidence of their felony convictions, because they were the only witnesses who directly incriminated him. Thomas contends that the trial court erred in denying his motion for a new trial on these grounds.

The record shows that in 2014 Emmett pleaded guilty in DeKalb County to theft by receiving stolen property and burglary in the first degree and that in 2015 Zeigler pleaded guilty in DeKalb

County to theft by receiving stolen property. Nothing in the record shows that the State provided defense counsel with any information about these convictions. In denying Thomas's motion for a new trial, the trial court found that "no *Brady* violation existed" because "the information was accessible to trial counsel."

(a) *The State's failure to disclose Emmett's and Zeigler's felony convictions.*

"[U]nder *Brady* and *Giglio*, the State violates due process when it suppresses evidence that materially undermines witness credibility[.]" *Southall v. State*, 300 Ga. 462, 469-470 (3) (796 SE2d 261) (2017) (citations omitted). To prevail on such a claim, Thomas was required to show that

> (1) the State possessed evidence favorable to his defense; (2) he did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

*Bryant v. State*, 298 Ga. 703, 705 (2) (784 SE2d 412) (2016) (citation and punctuation omitted). Because OCGA § 35-3-34 (a) (2) "makes

12

the criminal history records of witnesses in a criminal case available to the defendant upon written request," we have "held many times that *Brady* does not require the prosecution to turn over to the defense criminal records of [S]tate's witnesses." *Jackson v. State*, 306 Ga. 69, 89 (6) (d) (829 SE2d 142) (2019) (citation and punctuation omitted). Accordingly, there was no *Brady-Giglio* violation because with reasonable diligence defense counsel could have obtained information about Emmett's and Zeigler's felony convictions. See *Jackson*, 306 Ga. at 89 (6) (d).

(b) *Counsel's failure to investigate the witnesses' criminal histories.*

Thomas contends that his trial counsel performed deficiently by failing to investigate Emmett's and Zeigler's criminal histories, which he argues would have required minimal effort. Thomas argues that he was harmed by counsel's failure to investigate because counsel was not prepared to impeach Emmett and Zeigler with their felony convictions. Specifically, Thomas argues that, if the jury had not credited Emmett's pretrial statement identifying

13

Thomas as the shooter in the 2013 shooting, Wilson's testimony in that case would have lacked corroboration, as required under Georgia law because Wilson was an accomplice. See OCGA § 24-14-8. And Thomas argues that, if the jury had not credited Zeigler's pretrial statements, then the State would have had no evidence at all identifying Thomas as the shooter in the 2014 shooting.

> To establish ineffective assistance of counsel,
>
> a defendant must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466 U. S. 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). If [the defendant] fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test.

*Hill v. State*, 310 Ga. 180, 187 (3) (b) (850 SE2d 110) (2020) (citations and punctuation omitted). "To satisfy the deficiency prong [of the *Strickland* test], [Thomas] must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020).

In this case, the jury heard evidence that Emmett and Zeigler had criminal charges pending. Specifically, defense counsel cross-examined a detective on the fact that Emmett had a pending burglary charge against him at the time he was interviewed by investigators. And counsel cross-examined another detective about Zeigler being in jail charged with aggravated assault with a handgun at the time of his interview. In addition, the jury had other reasons to question both witnesses' credibility. At trial, Emmett refused to answer any of the State's questions. Zeigler's testimony that he was not shown a lineup was refuted by a detective's testimony, the lineup and accompanying form marked with Zeigler's identification of Thomas, and an audio recording of Zeigler viewing the line-up, identifying Thomas, and being instructed to fill out the form. And Zeigler's possible bias was revealed in his testimony that he had only identified Thomas because investigators insisted that he name Thomas, which he did so they would help him get bond on his pending aggravated assault charge. Defense counsel argued to the jury that Emmett's and Zeigler's identifications of Thomas

15

should not be believed for these and other reasons. Under the circumstances, even assuming (without deciding) constitutionally deficient performance, Thomas has not shown a reasonable probability that the result of the trial would have been different if counsel had been in a position to also argue that Emmett was not credible based on his conviction for theft by receiving stolen property and burglary and that Zeigler was not credible based on his conviction for theft by receiving stolen property. See *Clark v. State*, 309 Ga. 566, 572-573 (2) (847 SE2d 160) (2020); *Clark v. State*, 307 Ga. 537, 542 (2) (a) (837 SE2d 265) (2019); *Boothe v. State*, 293 Ga. 285, 295 (4) (745 SE2d 594) (2013).

2. Thomas contends that he received ineffective assistance of counsel based on his counsel's failure to request a jury instruction on impeachment with evidence of prior convictions after the testimony of Wilson, who had previously pleaded guilty to voluntary manslaughter in connection with the shooting death of Boyer. He argues that his counsel's reason for not requesting the jury instruction was not objectively reasonable. In a related argument,

16

Thomas contends that the trial court plainly erred in failing sua sponte to instruct the jury on impeachment by a prior conviction. Thomas contends that he was harmed by these failures because, without an instruction, the jury was not equipped to evaluate Wilson's credibility.

(a) *Counsel's failure to request a jury instruction on impeachment by a prior conviction.*

At the hearing on Thomas's motion for a new trial, his trial counsel testified that, although a jury instruction on impeachment by prior conviction was warranted by Wilson's testimony, he did not request the instruction as a matter of trial strategy. Counsel testified that, in his estimation, this jury instruction would not "add any value" to the general impeachment instructions[3] because the jury knew Wilson had made a deal with the State to plead guilty to voluntary manslaughter and avoid a life sentence. The trial court determined that counsel's strategy was sound because he had

---

[3] The trial court instructed the jury about impeachment with evidence disproving the facts testified to by the witness, with prior inconsistent statements, and with evidence of the witness's possible motive in testifying, including plea agreements and similar matters.

17

reasons not to discredit Wilson too broadly. We agree. Although in his pretrial statement, Wilson identified Thomas as one of the shooters, at trial he testified that Thomas was not in the vehicle during the drive-by shooting and was innocent of the crimes. Wilson even gave the defense an innocent explanation for the presence of Thomas's fingerprints in the vehicle Wilson stole mere hours before the shooting, by testifying that he gave Thomas a ride after stealing the vehicle but before he, Cosby-Hendon, and others went looking for members of Blocc to kill.

"[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Gardner v. State*, 310 Ga. 515, 518 (2) (852 SE2d 574) (2020) (citations and punctuation omitted). In particular, the decision about "which jury charges to request [is a] classic matter[ ] of trial strategy[.]" Id. (citations and punctuation omitted). It was consistent with an objectively reasonable defense strategy to attack Wilson's credibility only to the extent of his inculpatory pretrial

statement, on the basis that he obtained a plea agreement that avoided a life sentence by telling investigators what they wanted to hear. It was objectively reasonable not to have the jury instructed that Wilson's felony conviction could be considered as evidence of impeachment, given that his trial testimony was favorable to Thomas. Because Thomas has not shown that his counsel's performance was constitutionally deficient, as required by *Strickland*, the trial court did not err in denying Thomas's motion for a new trial on this ineffective assistance of counsel ground. See id.; *Walker v. State*, 296 Ga. 161, 171 (3) (b) (766 SE2d 28) (2014).

(b) *The trial court's failure to give sua sponte a jury instruction on impeachment by a prior conviction.*

As with his related ineffective assistance of counsel claim, Thomas contends that the evidence of Wilson's voluntary manslaughter plea warranted a jury instruction on impeachment by a prior conviction and that, without an instruction, the jury was not equipped to evaluate Wilson's credibility. Thomas argues that the trial court was required to give the instruction even absent a request

and that the failure to do so was plain error.

> To show plain error, the appellant must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this standard is difficult, as it should be.

*Clarke v. State*, 308 Ga. 630, 637 (5) (842 SE2d 863) (2020) (citation and punctuation omitted).

An appellate court can conclude that a defendant waived his right to a particular instruction "if the appellate court can discern a tactical reason on the part of the defense for failing to request (or object to, as the case may be) a specific jury instruction." *Vasquez v. State*, 306 Ga. 216, 230 (2) (c) (830 SE2d 143) (2019) (citation and punctuation omitted). As discussed above, the record reflects that Thomas's counsel elected not to request a jury instruction regarding impeachment by proof of a felony conviction as part of a conscious defense strategy to cast doubt on Wilson's pretrial inculpatory statement without casting doubt on his helpful trial testimony. Thus, we conclude that Wilson intentionally relinquished any

20

request for this impeachment instruction, and this claim of error therefore fails at the first step of plain error review. See id.

3. Thomas contends that his trial counsel performed deficiently by failing to make a timely motion to sever counts and to object to certain testimony.

(a) *Failure to make a timely motion to sever counts.*

Thomas contends that his counsel performed deficiently by failing to file a timely motion to sever the trial based on the two separate incidents and that the trial court would have granted a timely motion to sever.[4] Thomas also contends that his counsel performed deficiently by failing, when the trial court took up the motion to sever that counsel filed on the morning the trial began, to argue that the State's evidence would show that the 2013 shooting related to an issue between Blocc and DTB and that the 2014 shooting did not involve the same gang rivalry but instead involved

---

[4] Thomas's counsel filed a motion to sever on the morning the trial began, nearly two years after the date of arraignment. See OCGA § 17-7-110 (All pretrial motions "shall be filed within ten days after the date of arraignment, unless the time for filing is extended by the court.").

Blocc and Fenesco City.

> Where offenses are joined in a single indictment, a defendant has a right to severance where the offenses are joined solely on the ground that they are of the same or similar character because of the great risk of prejudice from a joint disposition of unrelated charges. However, where the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique. If severance is not mandatory, it is nevertheless incumbent upon the trial court to determine whether severance was necessary to achieve a fair determination of [the defendant's] guilt or innocence as to each offense. To make that determination, the court should consider whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

*Carson v. State*, 308 Ga. 761, 764-765 (2) (a) (843 SE2d 421) (2020)

(citations and punctuation omitted).

Although the trial court denied Thomas's motion to sever in part on the basis that it was untimely, the court reached the merits of the motion as well. The trial court's explanation of its ruling at the hearing shows that the court considered the factual bases and legal arguments advanced by Thomas's counsel, and the court found

22

that severance was not necessary to achieve a fair determination of Thomas's guilt or innocence as to each offense. In particular, the trial court considered the number and complexity of the offenses charged and determined that a trier of fact could parse the evidence and apply the law intelligently with regard to each charge. Thus, the record does not support Thomas's contention that the trial court would have granted the motion to sever if it had been timely filed, and he cannot show that he was prejudiced by counsel's tardiness.

In criticizing the substance of counsel's argument at the hearing on the motion to sever, Thomas argues that the evidence at trial showed that the two incidents did not involve the same gang rivalry, as the State contended. Specifically, Thomas argues that Zeigler testified at trial that the 2014 shooting arose out of a conflict between Blocc members and Fenesco City members; Zeigler, himself a member of Blocc, testified that Fenesco City and DTB were not the same group; and Wilson also testified that Fenesco City and DTB were separate groups. During the pretrial hearing on Thomas's motion to sever, however, Fenesco City was never mentioned, and

neither the State nor the defense mentioned Fenesco City in their opening statements. In fact the first reference to Fenesco City was by Zeigler on the third day of the trial.

"In evaluating the reasonableness of trial strategy, every effort should be made to eliminate the distorting effects of hindsight." *Griffin v. State*, 309 Ga. 860, 867 (3) (849 SE2d 191) (2020) (citation and punctuation omitted). "[T]rial counsel's performance is judged according to an objective standard of reasonableness, considering all the circumstances from counsel's perspective at the time of the challenged conduct, and in the light of prevailing professional norms." *Crouch v. State*, 305 Ga. 391, 400 (3) (825 SE2d 199) (2019) (citations and punctuation omitted). Considering all the circumstances from counsel's perspective at the time he moved to sever the trial of the two shootings, Thomas has not shown how his defense counsel could have anticipated that there would be evidence that a group other than DTB had a conflict with any Blocc members so that his counsel could have made the argument before trial that the two shootings did not arise out of the same gang rivalry. Indeed,

24

the gang expert testified that Fenesco City is a subset of DTB. Consequently, Thomas has not carried his burden under *Strickland* of showing that his counsel's representation was deficient in this respect. See id.; *Lee v. State*, 280 Ga. 521, 522 (2) (c) (630 SE2d 380) (2006).

(b) *Failure to object to hearsay.*

Thomas contends that his counsel performed deficiently by failing to object to Zeigler's testimony about the phone calls Wheeler received at the mall, including that Umba told Wheeler that "Tony" was on his way to the mall. Thomas also contends that his counsel should have objected to Wilson's recorded interview, in which he recounted what someone named "LJ" had told him about the second shooting, specifically that Thomas shot Zeigler, Wheeler, and a third person and that Splash was involved. Thomas contends he was prejudiced by the admission of the hearsay because it reinforced the hearsay from Zeigler that Umba, Splash, and Thomas were involved in the dispute at the mall that led to the second shooting.

Thomas does not challenge Zeigler's pretrial statements to the

detectives and to Wheeler's sister that he saw Thomas shooting at him, Wheeler, and Dennis while they were in the back of Johnson's car, which were admissible as prior inconsistent statements after Zeigler testified that he ducked and did not see the shooters. See *Bridgewater v. State*, 309 Ga. 882, 886-887 (2) (848 SE2d 865) (2020). Even if trial counsel was deficient for failing to object to the admission of additional evidence about the mall incident, which was circumstantial evidence that Thomas was involved in the shooting, Thomas was not prejudiced as a result, because of the strength of the direct evidence that he was one of the shooters. See *Shaw v. State*, 307 Ga. 233, 251 (6) (a) (835 SE2d 279) (2019); *Bryant v. State*, 306 Ga. 687, 696 (2) (b) (832 SE2d 826) (2019).

(c) *Failure to object to an expert witness's testimony as being speculative.*

Thomas contends that his counsel performed deficiently by failing to object to the State's gang expert's opinion testimony that Thomas was the author of a Twitter post and what was meant by the statements in the post. Specifically, Thomas argues that it was

26

deficient performance not to object to the gang expert's testimony that the following message contained in State's Exhibit 116 was posted by Thomas and referred to the death of Boyer: "Y'all sayin fuk my boi peewee like daz. Gne. Brang yall boi bak.asum. all I can do is send yall. Wit him. WAZZAM." Thomas argues that a person with no knowledge of the case could not infer anything about the meaning of the Twitter post because there is no mention of Boyer at all. Thomas contends that his counsel's failure to object to the testimony was harmful to him because it purported to provide some evidence of Thomas's guilt in the 2013 shooting, "a case that was supported by weak evidence."

The gang expert testified that he checked the MoneyMakin_TONY Twitter page after learning that several witnesses had reported that that was Thomas's page. The gang expert determined that the profile photo for the page was a photo of Thomas. The content of multiple messages posted on the page further supported the gang expert's conclusion that it was Thomas's page. State's Exhibit 116 shows that the message quoted above was

27

posted on May 16, 2013, with the handle "tony_dtbym" on the "MoneyMakin_TONY" page. The gang expert interpreted the first part of the post as "Y'all saying f*ck my boy Peewee like that's going to bring your friend back or something," and concluded that "like that's going to bring your friend back" meant that their friend was dead. And the gang expert interpreted the second part as "all I can do is send y'all with him" and concluded that was a threat to kill anyone who planned to harm the poster's friend, Peewee. The gang expert put the post in the context of the poster's handle (which included "Tony" and "DTB"), the post's timing (a few weeks after Boyer's death), and the post's reference to Wilson (by his nickname Peewee), who was involved in the shooting of Boyer, and concluded that Thomas posted the message and that it referred to the death of Boyer.

The post, as explained by the gang expert's opinion testimony, did not suggest that it was Thomas who shot Boyer or otherwise implicate him in the 2013 shooting. Even assuming counsel should have objected to the testimony, Thomas has not shown that he was

28

prejudiced by the gang expert's opinion testimony. See *Haney v. State*, 305 Ga. 785, 790 (2) (827 SE2d 843) (2019).

(d) Lastly, we consider the cumulative effect of prejudice resulting from any assumed deficiencies in counsel's performance. See *Mitchell v. State*, 308 Ga. 1, 9 (2) (f) (838 SE2d 820) (2020); see also *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007) ("[I]t is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (citation and punctuation omitted)). Here, the cumulative prejudice from any assumed deficiencies discussed in Divisions 1 (b), 3 (b), and 3 (c) is insufficient to show a reasonable probability that the results of the proceedings would have been different in the absence of the alleged deficiencies. See *Mitchell*, 308 Ga. at 9 (2) (f); *Davis v. State*, 306 Ga. 140, 150 (3) (j) (829 SE2d 321) (2019). We therefore see no merit in Thomas's claims of ineffective assistance.

*Judgment affirmed. All the Justices concur.*

Decided June 1, 2021.

Murder. DeKalb Superior Court. Before Judge Hydrick.

*Bentley C. Adams III*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Jason M. Rea, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smth, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.