315 Ga. 490
FINAL COPY

S22A0836.  WILLIAMS v. THE STATE.

BETHEL, Justice.

Antonio Lafonta Williams was convicted of felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of Martrell Gay. On appeal, Williams argues that: (1) the trial court plainly erred by admitting cell-site location information ("CSLI") secured through an insufficiently particularized "general" warrant; and (2) the trial court plainly erred by charging the jury that the testimony of a single witness was sufficient under OCGA § 24-14-8 without charging the jury on the need for corroboration of an accomplice's testimony.[1] For the reasons that follow, we affirm.

---

[1] The crimes occurred on March 7, 2015. On June 30, 2015, a Fulton County grand jury indicted Williams for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). At a jury trial held in August 2016, Williams was found guilty of Counts 2 through 4. The jury found

1. The evidence presented at trial showed the following.[2] On Saturday, February 21, 2015, Williams drove from his residence in Kings Mountain, North Carolina, to Atlanta with a friend[3] to celebrate the birthday of Williams's cousin, Tobias Sherrer. That night, Sherrer's friend, Ken Davis, helped Williams set up a meeting with Gay to buy a pound of marijuana for $900. After Williams gave Gay $900 for the marijuana, Gay told Williams that he did not have the marijuana on him and that he would have to go get it. Even though Williams attempted to follow Gay's car, Gay eventually sped away and never returned Williams's $900. The next morning,

Williams not guilty of Count 1. The trial court sentenced Williams to serve life in prison on Count 2 and five years in prison on Count 4, to be served consecutively with Count 2. Count 3 merged with Count 2 as a matter of law. On August 19, 2016, Williams filed a motion for new trial, which he amended through appellate counsel in November 2018. Following a hearing, the trial court denied the motion, as amended, on January 11, 2021. Williams timely filed a notice of appeal on January 25, 2021, which he amended on June 22, 2021. The case was docketed to this Court's August 2022 term and was submitted for a decision on the briefs.

[2] Because this case requires an assessment of whether certain assumed errors by the trial court were harmless, we lay out the evidence in detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 (1) n.2 (845 SE2d 653) (2020).

[3] The friend's name does not appear in the record, and he was not identified at trial.

Williams and his friend returned to North Carolina.

Both Sherrer and his mother, Jacqueline Sherrer, testified that on March 7, 2015, Williams unexpectedly arrived at Sherrer's house with Williams's cousin, Jeffrey Currant. Sherrer met Williams and Currant outside, got in Williams's car, and saw a "big gun" in the back seat. The gun was a black long gun that appeared to be a rifle or shotgun. Sherrer asked Williams to put the gun away before they drove around, and Williams wrapped it in a shirt and put it in the trunk.

Williams was still upset about the robbery and thought Sherrer and Davis had set him up. Sherrer told Williams that he did not, and Williams told Sherrer that he wanted to "get at" Gay. Williams then asked where Davis was, and they went to Davis's house. While at Davis's house, Williams mentioned that he needed to find Gay and that he needed his money. The four men left Davis's home and dropped Sherrer off at his sister's house.

Later that day, Gay was shot in the head at the West End Food Mart. Video surveillance recordings that were played for the jury

show that three men entered the Food Mart shortly after Gay entered. Gay ran to a corner on the left side of the store, appearing to try and hide but was shot by a man with multi-colored dreadlocks. Gay sustained one gunshot wound to the head. The video surveillance recording showed that Gay ran to the back of the store after being shot and had a conversation with the shooter while the shooter continued to periodically point the gun at Gay. Though the exact type of gun used in the shooting is unknown, the shooter can be seen on the video surveillance recording firing a handgun. The audio from the recording showed that someone said, "give me my sh*t bro" and "I ain't playing." The shooter left shortly before Gay walked out and collapsed on the sidewalk outside the store. Gay died later that day as a result of his injury.

Williams had red, white, and blue colored dreadlocks at the time of the shooting and was eventually arrested for the crimes. At trial, Sherrer testified that he previously identified Williams as the shooter from a clip of the video surveillance recording of the shooting

played on the news[4] and then again when he was shown the same video while he was later questioned at the precinct.[5] Williams's phone records, which were introduced at trial, placed him in the area of the shooting at the same time as the crimes. Additionally, Williams's time cards at work showed that he left work on Saturday, March 7, 2015, at 12:27 a.m., and he did not return to work that weekend.

Sherrer testified that at some point after the shooting, he attempted to call Williams several times to see if Williams could give him a ride. When Williams picked up the phone, he told Sherrer that he could not give him a ride and that he was getting ready to leave the Atlanta area to go home. Williams also mentioned that he needed to get rid of his phone before hanging up.

The video surveillance shows that Davis was at the Food Mart

---

[4] On March 8, 2015, law enforcement officials released to the media a short clip of the surveillance video depicting the perpetrator in hopes of obtaining leads as to the perpetrator and received multiple tips naming Williams as a suspect.

[5] The record also shows that the person who was working at the Food Mart as a cashier at the time of the shooting was later shown a photo lineup by the police. The witness identified someone different than Williams in the lineup.

shortly before the shooting. Davis is seen leaving the Food Mart after Gay enters and just before Williams does. Davis himself admitted that he is shown in the video. Davis testified at trial that the following occurred. After Williams and Currant dropped Sherrer off before the shooting, they also dropped Davis off so he could meet up with his brother. Later that day, while Davis was walking to the West End area, Williams and Currant drove by Davis and stopped to offer him a ride. Davis agreed, and the three then went to see a talent show at the Mall West End. But Davis left the talent show because he got a call from his brother. While he was out, he went into the Food Mart to get cigarettes but left because the line was too long. On his way out, he ran into a friend by the door. As he was speaking to the friend at the door, he heard gunshots and ran to Williams's car. By the time he got to the car, Williams was already there. Davis, Williams, and Currant then went to Davis's house to play video games before Williams returned to North Carolina.

To rebut the defense's theory that there was another potential shooter linked to Gay's drug dealings, the State elicited the following

testimony. Brittany Butler, Gay's girlfriend at the time of the shooting, testified that Gay was a "big time drug dealer." Both Butler and Timothy Jordan, one of Gay's friends, testified that Gay was having a "beef" with Steven Horn around the time of the shooting. The two apparently would steal from each other, and Horn previously sent threatening messages to Butler over Instagram. But both Butler and Jordan testified that Gay and Horn had reconciled before the shooting. Additionally, Detective Young testified that he immediately determined that Horn could not have been the shooter because at the time of the shooting, he had a "box" hair style and tattoos on his face, whereas the shooter on the video did not.

2. Williams contends that the trial court plainly erred by admitting CSLI related to Williams's cell phone because the search warrant authorizing the seizure of Williams's phone records[6] lacked

---

[6] For the records to be searched, the warrant states the following:

Verizon Telephone Number 704-718-8366 from the dates of February 27, 2015 through March 9, 2015.

- Subscriber Information

sufficient particularity as to the location to be searched. The warrant was obtained by law enforcement officials for Verizon Wireless's data related to Williams's cell phone number from February 27, 2015 through March 9, 2015. Law enforcement officials did not conduct a physical search of any property under the authority of the warrant. Instead, they accessed Verizon's online portal designed to facilitate execution of warrants of this sort and provided Verizon with the parameters of the search authorized by the warrant via the portal. Verizon, in turn, provided the responsive data pursuant to the request in an e-mail, which included the CSLI for Williams's cell

- Call Detail Logs
- Calling Number
- Dialed Number
- Call Duration
- Direction of call (incoming or outgoing)
- Data usage
- Store[d] SMS Content (sent or received)
- Logs of SMS/MMS sent or received
- Originating cell site (latitude and longitude)
- Terminating cell site
- Cell Site Sector Azimuth
- Location of Cell Towers
- Any reports of phone associated with the account being lost or stolen
- RTT/RTD (Range to Tower and Distance)

Which is (name the law being violated)
16-5-1 Murder

phone. Williams argues that because the warrant only specified "Verizon Wir[e]less, 07921, BEDMINSTER, NJ" as the location to be searched, it authorized a search of any Verizon building within that zip code in Bedminster, New Jersey, and therefore allowed law enforcement "significant discretion." Williams did not object to the admission of the evidence obtained through the warrant at trial. Here, he has failed to establish that the admission of the evidence constituted plain error because the trial court did not clearly or obviously err by admitting the CSLI evidence.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires that a search warrant "particularly describ[e] the places to be searched." U. S. Const. Amend. IV. See *Bryant v. State*, 301 Ga. 617, 619 (2) (800 SE2d 537) (2017) ("'A warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.'" (quoting *Groh v. Ramirez*, 540 U. S. 551, 557 (II) (124 SCt 1284, 157 LE2d 1068) (2004))). A

9

warrant was required for the search of CSLI related to Williams's cell phone. See *Carpenter v. United States*, \_\_\_ U. S. \_\_\_, \_\_\_ (III) & n.3 (138 SCt 2206, 2217, 201 LE2d 507) (2018).

Williams concedes that because his trial counsel did not move to suppress the CSLI procured by the search warrant based on particularity, this claim must be reviewed on appeal under the plain-error standard.[7] See OCGA § 24-1-103 (d). See also *Goins v.*

---

[7] In considering Williams's motion for new trial, the trial court held that plain-error review is not applicable to rulings on motions to suppress but nevertheless stated that even assuming that plain error applied, no clear or obvious error of law was committed. While the District Attorney defends the position that plain error is not available for rulings on motions to suppress, the Attorney General concedes it is available. We agree with the Attorney General.

The District Attorney first argues that plain error is not available under OCGA § 24-1-103 because Title 24 does not apply to motions to suppress, which are codified under Title 17 concerning Criminal Procedure. This is incorrect. Although Title 17 provides the procedure for motions to suppress filed in criminal proceedings, those motions clearly lead to "a ruling which admits or excludes evidence," which is in turn subject to review under OCGA § 24-1-103. And subsection (d) of that Code section indicates that plain-error review applies to such rulings when "such errors [are] not brought to the attention of the [trial] court." OCGA § 24-1-103 (d). Accordingly, plain error applies under OCGA § 24-1-103 (d) to a Fourth Amendment challenge to the admission of evidence, even when the defendant has not objected to or moved to suppress that evidence at trial.

Second, the District Attorney argues that under Georgia law, the failure to raise a Fourth Amendment claim before the trial court constitutes a waiver that precludes plain-error review. See *Rockholt v. State*, 291 Ga. 85, 88 (2) (727 SE2d 492) (2012); *Young v. State*, 282 Ga. 735, 738 (653 SE2d 725) (2007); *Rucker v. State*, 250 Ga. 371, 371, 375 (11) (297 SE2d 481) (1982); *Gonzalez v.*

*State*, 310 Ga. 199, 204 (4) (850 SE2d 68) (2020) (reviewing the

admissibility of evidence obtained during a search of a cell phone for

plain error where trial counsel failed to obtain a ruling on a motion

to suppress or object when the evidence was admitted during the

trial). Plain-error review consists of four prongs:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State*, 334 Ga. App. 706, 709-710 (1) (780 SE2d 383) (2015). But the cases cited in support were decided under the old Evidence Code, which did not include an equivalent to the current OCGA § 24-1-103 (d). See *Davis v. State*, 299 Ga. 180, 192 (3) (787 SE2d 221) (2016) (noting the importance of advocates recognizing the distinction between the new Evidence Code and the old one and of advocates analyzing and applying the correct law under the new Evidence Code). While a party may still affirmatively waive review of an unraised Fourth Amendment challenge, the claim is not waived simply by the party's failure to raise the challenge before the trial court. Accordingly, plain error applies here where there is no indication in the record that Williams affirmatively waived this Fourth Amendment challenge.

(Citation and punctuation omitted; emphasis in original.) *Stanbury v. State*, 299 Ga. 125, 129 (2) (786 SE2d 672) (2016). "Satisfying all four prongs of this standard is difficult, as it should be." (Citation and punctuation omitted.) *Hood v. State*, 303 Ga. 420, 426 (2) (a) (811 SE2d 392) (2018).

We need not analyze all four prongs because Williams has failed to establish that the trial court clearly or obviously erred by admitting the CSLI evidence. See *Payne v. State*, 314 Ga. 322, 325 (1) (877 SE2d 202) (2022) ("[We do] not have to analyze all elements of the plain-error test where an appellant fails to establish one of them."). "An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." (Citations and punctuation omitted.) *Wilson v. State*, 291 Ga. 458, 460 (729 SE2d 364) (2012).

To that end, Williams has not offered any controlling authority, and we have found none, requiring that a warrant particularly

describe the physical location of data in a search warrant seeking electronic records housed in a cell service provider's database that is accessed through an online portal.[8] This claim of plain error therefore fails.[9]

3. Williams also contends that the trial court plainly erred

---

[8] Williams cites only *Vaughn v. State*, 141 Ga. App. 453, 454 (1) (233 SE2d 848) (1977), and *United States v. Williamson*, 1 F3d 1134, 1136 (10th Cir. 1993), for the proposition that the fatal lack of particularity in the warrant here was clear or obvious. But neither case provides meaningful or controlling guidance concerning the particularity required for a search of digital CSLI records accessed via an online portal. *Vaughn* involved a physical search of a residence with a warrant that failed to include the city, county, or state of the residence. See *Vaughn*, 141 Ga. App. at 454 (1). *Williamson* involved a physical search of a place of business located miles away from the residential mailing address noted on the face of the warrant. See *Williamson*, 1 F3d at 1136.

[9] While it is clear that Williams has a protected interest in the records associated with his phone number, see *Carpenter*, 138 SCt at 2217 (III), it is less clear whether he has a reasonable expectation of privacy, protected by the Fourth Amendment, in Verizon's physical property beyond those records. See *Smith v. State*, 284 Ga. 17, 21 (3) (663 SE2d 142) (2008) ("In order to claim the protection of the Fourth Amendment against unreasonable search and seizure, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." (citation and punctuation omitted)). Williams fails to point to any controlling authority establishing that he has an interest in buildings owned by a third party where the third party digitally stores Williams's digital information such that he may challenge the particularity of the location of any building searched as listed within a warrant. However, because neither party addressed this issue in its briefing before this Court, we will assume, without deciding, that Williams has a protected interest in the physical Verizon buildings within Bedminster, New Jersey, such that he has standing to challenge the description of the address within a warrant.

when it instructed the jury under OCGA § 24-14-8 that a single witness's testimony is sufficient to establish a fact without also instructing that an accomplice's testimony must be corroborated. He argues that this instruction was required because Davis was Williams's accomplice and that reversal is warranted. But there was no plain error because Williams failed to show that any error in failing to give the instruction affected his substantial rights.

"The testimony of a single witness is generally sufficient to establish a fact" under Georgia law. OCGA § 24-14-8. But, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]" Id. Therefore, "a felony conviction cannot be sustained solely by the uncorroborated testimony of an accomplice." (Citation and punctuation omitted.) *McKibbins v. State*, 293 Ga. 843, 846 (1) (750 SE2d 314) (2013). Williams concedes that "because he did not request this instruction and failed to object to its omission, his claim of error is reviewed only for plain error." *Pindling v. State*,

14

311 Ga. 232, 235 (2) (857 SE2d 474) (2021). See also OCGA § 17-8-58 (b) ("Failure to object . . . shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties.").

Even assuming that the evidence of Davis's complicity was sufficient to require the giving of an accomplice-corroboration instruction, see *Doyle v. State*, 307 Ga. 609, 612 (2) (a) (837 SE2d 833) (2020), Williams has failed to establish that the trial court's failure to give the instruction affected his substantial rights. See *Payne*, 314 Ga. at 325 (1). See also *State v. Johnson*, 305 Ga. 237, 240 (824 SE2d 317) (2019) ("The third prong of the plain error test requires that the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it likely affected the outcome of the trial court proceedings."). In his testimony, Davis described the prior incident where Gay stole $900 from Williams and placed Williams at the Mall West End area at the time of Gay's murder. But all of the material

15

facts from his testimony were independently corroborated by other witnesses and evidence, such that Davis's testimony was cumulative of other evidence properly admitted at trial. For example, Williams was placed in the West End area by the video surveillance of the shooting, Sherrer and his mother's testimony, and the CSLI of Williams's cell phone. Additionally, Sherrer not only corroborated the details about Gay stealing Williams's money in February, but he actually gave more information than Davis did. Due to the extensive corroboration of the relevant portions of Davis's testimony and the other significant independent evidence of Williams's guilt, it is not likely that giving an accomplice-corroboration charge would have affected the verdict. See *Hawkins v. State*, 304 Ga. 299, 303 (3) (818 SE2d 513) (2018) (noting that even though the failure to charge on accomplice corroboration was a clear or obvious error, it was not plain error because the accomplice's testimony was corroborated by "significant and consistent evidence" through the appellant's own admission, eyewitness accounts, and security camera footage); *Lyman v. State*, 301 Ga. 312, 318-319 (2) (800 SE2d 333) (2017)

16

(concluding that the failure to instruct on accomplice corroboration was harmless because multiple non-accomplice sources linked the defendant to the crime). Accordingly, Williams has failed to demonstrate plain error in regard to the failure to give this jury instruction.

*Judgment affirmed. All the Justices concur, except LaGrua, J., disqualified.*

Decided February 7, 2023.

Murder. Fulton Superior Court. Before Judge LaGrua.

*Ross & Pines, Noah H. Pines, Andrew S. Fleischman*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.

17