NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 16, 2023

S23A0203. WILLIAMS v. THE STATE.

ELLINGTON, Justice.

Brandon Williams appeals his convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Corey Coleman.[1] Williams contends that the trial court erred when it did not allow him to show his left arm during the cross-examination of a detective, when it

---

[1] The crimes occurred on May 10, 2008. On December 17, 2013, a Fulton County grand jury indicted Williams for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. After a jury trial that ended on December 4, 2017, Williams was found guilty on all counts. On December 5, 2017, Williams was sentenced to serve life in prison for malice murder and a consecutive five-year prison term for the firearms charge. The felony murder count was vacated by operation of law, and the remaining count of aggravated assault was merged into the malice murder conviction for sentencing purposes. Williams filed a timely motion for new trial, which he amended through new counsel on December 22, 2020, and January 26, 2021. After a hearing on June 23, 2022, the trial court denied the amended motion for new trial on August 25, 2022. Williams filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2022 and orally argued on February 8, 2023.

allowed testimony about a deceased person's out-of-court identification of Williams, when it failed to charge the jury on self-defense, and when it allowed introduction of Coleman's statements to his mother. Williams also contends that he received ineffective assistance of trial counsel. Finally, Williams contends that the cumulative errors created sufficient prejudice that he must receive a new trial. Because Williams has failed to show reversible error, we affirm.

The evidence submitted at trial shows the following. Coleman's mother testified that in late 2007, then 16-year-old Coleman moved out of her house to live with a friend because "he was scared." Near the beginning of May 2008, Coleman moved back to his mother's house but remained fearful, would not go out much, moved his bed away from the window, and asked about moving away again.

On the evening of May 10, 2008, Coleman attended a neighborhood party with his nephew and two friends. They eventually walked to another house and knocked on the door. A black man with light skin and dreadlocks, identified by Coleman's

group as "B" or "Little B" or "Brandon," looked out the window and, with a gun in his possession, walked past Coleman's group out of the house as the group went in. Other witnesses confirmed that "B" or "Brandon" was present at the house that evening.

Once Coleman was inside the house, he pulled a black Hi-Point .380-caliber pistol out of his coat, began loading it, and placed it on a table in front of him. Soon afterwards, "B" came back into the house and fired several rounds at Coleman from a chrome .380-caliber pistol with a black handle. No one saw Coleman pick up his pistol or point it at "B." Instead, Coleman began to run but was shot in the back and collapsed. The shooter ran out of the house. One of Coleman's friends, Andre Reese, took Coleman's pistol from the table, threw it into some bushes, and later sold it.

Coleman was transported to a hospital emergency room but died from a single gunshot that entered his left mid-back, "kind of on the side," and exited his right abdomen. The medical examiner testified that, when Coleman was shot, he could not have been facing the shooter, that Coleman was not shot at close range, and that he

3

likely was not shot during a struggle. The police were not able to recover either pistol, but were able to recover three bullets and three cartridge cases from the floor and a table at the crime scene. Expert firearms and toolmark analysis showed that all of those bullets were .380-caliber and were discharged from the same pistol, but not from a Hi-Point pistol. All three cartridge cases were fired from one pistol, which was "very possibl[y]" the same pistol from which the bullets were fired.

Police showed Coleman's nephew and two friends a photographic lineup that included Brandon Nolan because Reese thought the shooter's last name might be something like Knowles or Knowley, but neither Reese nor anyone else was able to identify the shooter from that lineup. Reese then showed police the house where he said "the Brandon that shot [Coleman] used to live." Because Williams had been associated with the address of that house, he was included in a new lineup. Coleman's nephew and two friends identified Williams, quickly and with certainty, from that new lineup as the shooter. A warrant was issued for Williams's arrest,

but he was not apprehended until, almost eight years later, he was arrested in North Carolina for an unrelated offense and officers there discovered his outstanding arrest warrant in Georgia.

1. Williams contends that the trial court violated his right to a thorough and sifting cross-examination when it did not allow him to show his left arm during the cross-examination of the lead detective. However, Williams failed to preserve this claim for ordinary appellate review with an offer of proof, and he failed to show that there was plain error.

One of Coleman's friends who was with him at the time of his murder, Shenard Shears, had seen the shooter about five months earlier walking on the street and told investigators that he believed the shooter had a tattoo on his left arm. The lead detective testified on cross-examination that he never verified whether Williams did in fact have a tattoo on his left arm. Defense counsel then requested permission for Williams to stand and show his arm, but the State objected at a bench conference that defense counsel was "basically trying to get her client to testify without testifying" in a way that

5

would subject him to cross-examination. Defense counsel responded that Williams would "take off his jacket and roll up his sleeve" and she would just ask whether in fact the detective "does see a tattoo on my client's arm." The trial court denied the request "at this time." Defense counsel stopped questioning the detective about the tattoo and made no further request or offer of proof.

(a) A party cannot obtain ordinary appellate review of a trial court's ruling excluding evidence unless "the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked." OCGA § 24-1-103 (a) (2) ("Rule 103 (a) (2)"). See also *McGarity v. State*, 311 Ga. 158, 162 (2) (856 SE2d 241) (2021) ("To obtain ordinary appellate review of a trial court's ruling excluding evidence, 'the substance of the evidence (must have been) made known to the court by an offer of proof or (been) apparent from the context(.)'") (quoting Rule 103 (a) (2)). This rule requires that both the substance of the evidence in question and the reason for offering it be made known or be apparent to the trial court. See *Williams v.*

6

*State*, 302 Ga. 147, 151 (2) (805 SE2d 873) (2017). This requirement cannot be met after trial. See *United States v. Morrison*, 833 F3d 491, 505 (III) (A) (5th Cir. 2016) ("The offer of proof required by Federal Rule of Evidence 103 (a) (2) is meant to give the trial judge contemporaneous knowledge about the proposed evidence at the time it is offered. Presentation of an offer after the trial or on appeal does not help the trial judge, and is too late." (citation and punctuation omitted)).[2]

---

[2] Rule 103 (a) (2) does not specifically provide, and we have found no Georgia case that clarifies, the exact time by which an offer of proof must be made. And there is limited case law on that issue from federal courts, as well as state courts in jurisdictions that have adopted a similar rule. Some courts that have addressed the issue require an offer of proof at the time of the trial court's ruling, while others allow later offers of proof, but we have found no cases allowing the offer of proof to be made after trial. See 21 Kenneth W. Graham, Jr., Federal Practice and Procedure (Wright & Miller) § 5040.2 & nn. 15, 16 (2d ed., Apr. 2023 update) (collecting cases). We look for guidance to federal authority because the corresponding federal rule includes a provision materially identical to our Rule 103 (a) (2). See *State v. Almanza*, 304 Ga. 553, 556 (2) (820 SE2d 1) (2018) ("if a rule in the new Evidence Code is materially identical to a Federal Rule of Evidence, we look to federal case law"); *Walker v. State*, 301 Ga. 482, 488 (3) (801 SE2d 804) (2017) (looking to federal authority applying the portion of Federal Rule of Evidence 103 that is analogous to our Rule 103 (a) (2)). And "[i]n the case of conflicts among the decisions of the various circuit courts of appeals in interpreting the federal rules of evidence, the precedent of the Eleventh Circuit prevails." *Almanza*, 304 Ga. at 559 (3) (citation and punctuation omitted). The Eleventh Circuit has allowed offers of proof after the time of the trial court's ruling, specifically at a conference on

7

In this case, although Williams testified at the hearing on his motion for new trial that he did not have a tattoo on his left arm, he did not make the precise, specific content of the evidence known during trial. See *Walker v. Kane*, 885 F.3d 535, 539 (II) (A) (8th Cir. 2018) ("stress[ing] the importance of expressing precisely the substance of the excluded evidence by stating with specificity what he or she anticipates will be the witness'[s] testimony or, at the trial court's discretion, by putting the witness on the stand, outside the presence of the jury, and eliciting responses in a question and answer format" (citation and punctuation omitted)); *United States v. Adams*, 271 F3d 1236, 1242 (A) (10th Cir. 2001) ("Specificity and detail are the hallmarks of a good offer of proof of testimony."); *United States v. Baptista-Rodriguez*, 17 F3d 1354, 1372 (V) (B), n.27

---

evidentiary questions held during the trial, but an offer of proof after trial would be inconsistent with the Eleventh Circuit's articulation of the purposes of the proffer requirement Rule 103 (a) (2) as "to give the trial court a chance to correct errors which might otherwise require a new trial" and "a chance to reevaluate [its] ruling in the light of the evidence to be offered." *Murphy v. City of Flagler Beach*, 761 F2d 622, 626 (11th Cir. 1985) (construing Fed. R. Evid. 103).

(11th Cir. 1994) (an offer of proof serves the function of informing the court and opposing counsel of the "precise substance" of the evidence at issue).[3] Nor was the substance of the evidence otherwise apparent from the context. To the contrary, what the evidence would show was not presented to or discussed with the trial court at any time before or during trial.[4] Any assumption about the condition of

---

[3] See also 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:14 (4th ed., July 2022 update) (Informing the trial court of the "substance" of the evidence being offered "means spelling out in some detail what the witness is expected to say, and not simply saying that the witness will address a certain issue in the case.").

[4] See 1 Mueller, supra at 1:13 (For the substance of the evidence to be apparent, the context in which questions are asked must make "clear not only the general subject of the expected response, but the actual tenor or substance of the response."); 21 Kenneth W. Graham, Jr., Federal Practice and Procedure (Wright & Miller) § 5040.4 (2d ed., Apr. 2023 update) (No federal case holds that the substance of the excluded evidence can be made apparent under Federal Rule 103 (a) (2) through the use of "illuminating" questions. Instead, examples of the substance of the evidence being apparent from the context include "where the evidence has been introduced, then subsequently stricken[,] the evidence appears in a motion in limine[,] both sides quote from the evidence during argument on the objection[, or] the substance of the evidence appears in the trial judge's ruling."). Cf., e.g., *Hand v. South Ga. Urology Ctr.*, 332 Ga. App. 148, 159 (769 SE2d 814) (2015) (on motion for reconsideration) (holding that despite the lack of a formal proffer, the issue of the propriety of excluding certain evidence was preserved under Rule 103 (a) (2) where the record was "replete with discussions between both parties and the trial court" regarding what the evidence would show), disapproved on other grounds, *Philips v. Harmon*, 297 Ga. 386, 398 (II) n.10 (774 SE2d 596) (2015); *United States v. Herrera*, 51 F4th 1226, 1286 (8) (A) (1) (10th Cir. 2022) (holding that contents of recorded statements that were excluded from evidence were apparent from

9

Williams's left arm would have been purely speculative. The trial court therefore never had a chance during trial to make a ruling in light of the evidence to be offered. Accordingly, Williams is limited to appellate review of this issue only for plain error. See *Walker v. State*, 301 Ga. 482, 487 (3) (801 SE2d 804) (2017) (rejecting ordinary appellate review and relegating appellant to review for plain error where the substance of the excluded testimony "was not apparent from the discussion at trial, nor was it made known to the trial court by an offer of proof").

(b) To establish plain error, Williams must show that he did not affirmatively waive the error, that the error is "clear or obvious, rather than subject to reasonable dispute," that it "affected [his] substantial rights," and that it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *McGarity*, 311

---

the context because the trial court "listened to this recording and discussed its admissibility"); *Frederick v. Swift Transp. Co.*, 616 F3d 1074, 1083 (10th Cir. 2010) ("[A] proffer of evidence at trial is not needed to satisfy the rule if the excluded evidence was previously discussed with the trial judge, for example at the pre-trial conference, so that during trial the judge is well aware of the content and purpose of the evidence." (citation and punctuation omitted)).

10

Ga. at 162 (2) (citation and punctuation omitted). "As to the second part of the test, an error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point or if a defendant's theory requires the extension of precedent." *Early v. State*, 313 Ga. 667, 672-673 (2) (b) (872 SE2d 705) (2022) (citation and punctuation omitted). "To show that an error affected his substantial rights, [the appellant] must make an affirmative showing that the error probably did affect the outcome below." *McKinney v. State*, 307 Ga. 129, 135 (2) (b) (834 SE2d 741) (2019) (citation and punctuation omitted). "Satisfying all four prongs of this standard is difficult, as it should be. The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." *Hooper v. State*, 313 Ga. 451, 457 (2) (870 SE2d 391) (2022) (citation and punctuation omitted).

Williams insists that he himself would not have been testifying if his counsel had merely asked whether the witness could see a tattoo on his arm. Williams relies on cases from other jurisdictions

to argue that a defendant displaying parts of his body to the jury would not open the door to his cross-examination. In a Georgia case, however, our Court of Appeals held that the trial court did not abuse its discretion in denying the defendant's request of a police officer during cross-examination to examine the defendant's arm and tell what tattoos he sees because what the defendant sought "was not related to a legitimate purpose of cross-examination, but to introduce evidence without the burden of cross-examination." *Jefferson v. State*, 312 Ga. App. 842, 850 (3) (720 SE2d 184) (2011).[5] See also id. at 850-851 (3) ("Overreaching cross-examination may not be used as a vehicle to enable a party to present non-testimonial

---

[5] Although this holding in *Jefferson* may be problematic, it is not inapplicable on the basis that it applied the statutory "right of a thorough and sifting cross-examination" set forth in former OCGA § 24-9-64. Georgia case law as to cross-examination pursuant to that former statute still applies under the same "right of a thorough and sifting cross-examination" in current OCGA § 24-6-611 (b). See *Parks v. State*, 300 Ga. 303, 309 (3) n.6 (794 SE2d 623) (2016) (noting that a certain case "was decided under the old Evidence Code pursuant to former OCGA § 24-9-64 (right of a thorough and sifting cross-examination), but its holding is not contradictory to the newly enacted OCGA § 24-6-611 (b)"); *Smith v. Laney*, 358 Ga. App. 754, 758 (1) (b) n.2 (856 SE2d 355) (2021) ("OCGA § 24-6-611 (b) of our current Evidence Code does not track the relevant Federal Rule of Evidence but is instead materially identical to the previous OCGA § 24-9-64, and so our longstanding Georgia case law as to cross-examination under that statute still applies.").

evidence without being subject to oath, or to subvert the ability of the opposing party to cross-examine the party proposing such non-testimonial evidence." (citation and punctuation omitted)).

This holding of *Jefferson* may be suspect. However, Williams has not asked that we overrule *Jefferson*, and it would make no difference if he had. See *Ellington v. State*, 314 Ga. 335, 345 (3) (877 SE2d 221) (2022) ("[T]o the extent that [the defendant's] appellate argument is based on his contention that [a certain case] should be overruled, plain error cannot be based on an extension of existing precedent, much less on the overruling of existing precedent." (citation and punctuation omitted)); *Wilson v. State*, 312 Ga. 174, 181 (1) (c) (860 SE2d 485) (2021) ("Some of us doubt that [certain controlling authority] was correctly decided, . . . [b]ut this is not the case for us to reconsider [that authority], because we are reviewing [the appellant's] claim for plain error."). Because Williams "has pointed to no [Georgia] precedent holding" that a trial court must allow cross-examination of a law enforcement officer regarding the presence or absence of tattoos based on a courtroom examination of

the defendant's arm, and because currently "existing legal authority stands for the contrary position," the alleged error "must be considered subject to reasonable dispute and thus cannot constitute plain error." *Ash v. State*, 312 Ga. 771, 794-795 (5) (a) (865 SE2d 150) (2021) (citation and punctuation omitted). See also *Wilson v. State*, 312 Ga. 174, 179 (1) (c) (860 SE2d 485) (2021) ("given current law supporting the trial court's [evidentiary] ruling, we cannot say that the ruling amounted to clear and obvious error beyond reasonable dispute" (citation and punctuation omitted)). Thus, we need not consider whether any error probably would have affected the outcome below or seriously affected the fairness, integrity or public reputation of judicial proceedings. See *Williams v. State*, 315 Ga. 490, 496 (2) (883 SE2d 733) (2023) ("We need not analyze all four prongs because [the appellant] has failed to establish that the trial court clearly or obviously erred by admitting the . . . evidence.").

2. Williams also contends that the trial court erroneously allowed testimony by the lead detective that a person who died before trial had made a positive identification of Williams when she

14

"pick[ed] out" Williams from a photographic lineup. Williams asserts that such testimony violated the hearsay rule, see OCGA § 24-8-802, and the Confrontation Clause contained in the Sixth Amendment to the United States Constitution. Assuming without deciding that this issue was properly preserved for ordinary appellate review and that the admission of the detective's testimony about the now-deceased person's photo lineup identification was not properly admitted, such error was harmless beyond a reasonable doubt.

Even an error of constitutional magnitude such as a denial of the right of confrontation may be considered "harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict," as when the evidence in question is cumulative of other evidence that was either properly admitted, *Armstrong v. State*, 310 Ga. 598, 605 (3) (852 SE2d 824) (2020) (citation and punctuation omitted), or presented without objection and not challenged on appeal, see *Hardy v. State*, 306 Ga. 654, 662 (4) (832 SE2d 770) (2019) (holding that even if testimony was admitted in violation of the Confrontation Clause, it was harmless

15

beyond a reasonable doubt, given other testimony that was presented without objection and that was not challenged on appeal). Here, the testimony that the now-deceased person had "picked out" Williams in the lineup was cumulative of the actual photo lineup that had been shown to her, on which she circled and initialed Williams's photo. The information on that actual photo lineup was the same as that to which the lead detective testified, but it was admitted at a later time during the detective's examination after defense counsel said that she had "[n]o objection" to its admission. And Williams does not challenge admission of the actual photo lineup on appeal. Moreover, several other witnesses also selected Williams in a photographic lineup and identified him at trial as the shooter. Indeed, the evidence identifying and inculpating Williams was strong. We conclude, therefore, that the admission of the detective's testimony about the now-deceased person's out-of-court identification of Williams was harmless beyond a reasonable doubt. See *McCord v. State*, 305 Ga. 318, 324 (2) (a) (i) (825 SE2d 122) (2019) (holding that even if admission of certain statements violated

16

the Confrontation Clause, any error was harmless beyond a reasonable doubt because they were cumulative of other statements made by the same witness and the other evidence against the defendant was strong).

3. Williams contends that the trial court erred when it failed to charge the jury on self-defense. He argues that the trial court was required to give such a charge even without a request because it was his sole defense and there was at least slight evidence to support it. Williams, however, has failed to show plain error as it is not obvious under our precedent that there was slight evidence to support a jury charge on self-defense.

Regardless of whether self-defense was Williams's sole defense,[6] "[w]here a defendant does not request that the trial court give a jury instruction, as [Williams] admits he did not here, this Court only reviews for plain error." *Munn v. State*, 313 Ga. 716, 722 (3) (873 SE2d 166) (2022). "To authorize a jury charge, there must

---

[6] We note, however, that self-defense was not Williams's sole defense. As explained in Division 5 (c), infra, Williams presented the defense that he was not present at the crime scene.

17

be slight evidence supporting the charge." Id. "In determining whether evidence supporting a justification instruction was presented at trial, we can consider only the evidence that the record shows was actually presented to the jury." *Powers v. State*, 297 Ga. 345, 348 (2) (773 SE2d 751) (2015). "A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]" OCGA § 16-3-21 (a).

Williams did not testify, no statement of his was admitted into evidence, and none of the evidence at trial showed that Coleman threatened or assaulted anyone, that Williams saw Coleman either reach for the gun that he placed on the table or have it in hand, or that they fought or struggled with each other. Instead, the undisputed evidence shows that when Coleman was shot, he was not facing Williams but was turned more than halfway toward the opposite direction and was not close to him. Nevertheless, Williams relies on two witnesses to support his claim that there was at least

18

slight evidence of self-defense.

First, Williams relies on the testimony of Rufus Hammonds, the owner of the house where the murder occurred, that after Coleman and his friends came into the house on the day of the incident, there was some argument and a struggle. But Hammonds never testified who was involved in the argument and struggle. Williams also asserts that Hammonds testified the gunshots happened only after the struggle, but the transcript does not support that assertion. Indeed, Hammonds never testified when the struggle occurred; the most that defense counsel could elicit from Hammonds was an agreement that gunshots went off after the struggle "according to this" document. The referenced document apparently was Hammonds's pre-trial statement, which was being used at trial to refresh his recollection and which was never admitted into evidence. On further questioning by defense counsel about whether Hammonds's recollection had been "refreshed as to whether or not there were gunshots after the struggle," Hammonds testified that "[t]here were gunshots but I don't think I was available when it

happened." Thus, while a document not admitted into evidence may have addressed the timing of a struggle, the admitted testimony included nothing relevant to such timing. See *Rush v. Illinois Central R. Co.*, 399 F.3d 705, 717-718 (III) (A) (1) (6th Cir. 2005) ("[T]he trial court may abuse its discretion when otherwise inadmissible evidence is introduced to the jury through the guise of refreshing a witness's recollection. . . . Rule 612[7] requires a witness whose memory has been refreshed to testify from his present recollection, rather than to merely restate the contents of the writing. . . . It is the witness's present refreshed recollection—as opposed to the contents of the writing used to refresh memory—that is the substantive evidence of the matter at issue.").

Second, Williams relies on the testimony of Vernice Beard that right after Coleman took a gun out of his coat, "B" came up and started shooting. Beard also testified that she was sitting at the

---

[7] Because the rule of evidence in OCGA § 24-6-612 (a) that addresses a witness's use of a writing to refresh his memory while testifying is materially identical to the portions of Federal Rule of Evidence 612 that address the same, we look to federal case law in construing our own rule. See *Almanza*, 304 Ga. at 556 (2).

table near Coleman when he took his gun out, that "bullets were falling out" from somewhere, that she told Coleman "[d]on't point that gun over this way," and that once she said that, "B" came up and started shooting. Beard never testified that there was an argument or a struggle, that Coleman pulled a gun on Williams, that Coleman even knew Williams was back in the house, that Coleman was going to use the gun, or that he did anything with the gun other than take it out of his coat. Instead, Beard testified that she did not know why Coleman took the gun out, that he did not point the gun at Williams, and that she could not say whether Coleman was pointing the gun anywhere. Beard's testimony did not show any threat or assault or anything more than Coleman's possession and handling of a gun and bullets near the time that he was shot, but rather showed that Williams was the aggressor. See *Green v. State*, 302 Ga. 816, 817, 818 (2) (a) n.2 (809 SE2d 738) (2018) (holding that there was no evidence to support a jury instruction on self-defense where the victim went outside his home with a "big gun" by his side to meet the defendant, who had accused the victim of stealing from

21

him, but the victim did not attempt to use the gun before the defendant attacked the victim and a friend of the defendant shot the victim); *Powers v. State*, 297 Ga. 345, 349 (2) (773 SE2d 751) (2015) ("[A] defendant is not entitled to a jury instruction on justification when the evidence is that the supposedly justified party was the aggressor.") (citing OCGA § 16-3-21 (b) (3)); *Hunter v. State*, 281 Ga. 693, 694-695 (2) (642 SE2d 668) (2007) (holding that nothing in the evidence warranted a charge on self-defense where the defendant did not testify, no statement of his was admitted into evidence, no other evidence contained any version of events from his own perspective, and there was no evidence of any threat so as to give rise to a reasonable belief that the defendant must shoot the victim in the back of the head to avoid death or great bodily injury, even though testimony showed that the victim possessed a gun before the shooting); *Smith v. State*, 267 Ga. 372, 377 (11) n.6 (477 SE2d 827) (1996) ("[I]t made no difference whether or not the victim had a gun because there was no evidence that the victim threatened or assaulted anyone prior to the shooting.").

Williams cites no precedent, and we have found none, requiring a self-defense instruction under circumstances that are similar to those presented here. See *Davis v. State*, 312 Ga. 870, 874 (2) (866 SE2d 390) (2021) (holding on plain-error review that "there was no obvious error in the trial court's refusal to give a voluntary manslaughter instruction" where the appellant cited "no precedent requiring a voluntary manslaughter instruction under circumstances similar to those presented" in that case and this Court found none). In short, it was not obvious or beyond reasonable dispute that there was at least slight evidence Williams reasonably believed that shooting Coleman was necessary to defend himself from any imminent use of unlawful force. See *Rodrigues v. State*, 306 Ga. 867, 871 (2) (834 SE2d 59) (2019) ("[T]he doctrine of reasonable fear does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing." (citation and punctuation omitted)); *Broussard v. State*, 276 Ga. 216, 217 (2) (576 SE2d 883) (2003) (The trial court properly refused to charge on self-defense where all of the

23

evidence, "including the fact that the fatal wound was to the back, was consistent with Appellant firing the gun as the victims were attempting to flee. Therefore, even assuming that [one victim] may have held the weapon at some point, [the appellant] could not have been in imminent fear at the time he committed the acts for which he was being tried.") (citation omitted). Accordingly, we need not consider whether any error probably would have affected the outcome below or seriously affected the fairness, integrity or public reputation of judicial proceedings, see *Williams*, 315 Ga. at 496 (2), and Williams has failed to meet the plain-error test.

4. Williams contends that the trial court erroneously allowed, over his hearsay objection, the introduction of Coleman's statements to his mother that he had been threatened and that he was scared "of someone named B." Assuming without deciding that the trial court erred in admitting into evidence the testimony of Coleman's mother about these statements, see *Ward*, 313 Ga. at 272 (3) (c), that testimony was harmless because it was cumulative of other testimony given by Coleman's mother and Reese. Coleman's mother

24

testified extensively about how fearful he was after moving back home, and Reese testified without objection that Coleman stated "Little B" had "shot at him before" and that Reese knew Coleman was "scared" when he saw Williams at Hammonds's house because Coleman's "eyes got real big." Given the strength of the evidence identifying and inculpating Williams, the cumulative nature of the testimony about Coleman's statements to his mother, and the lack of detail in those statements, any error in admitting them was harmless. See *Jones v. State*, 315 Ga. 117, 122 (4) (880 SE2d 509) (2022) ("A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." (citation and punctuation omitted)); *Ward*, 313 Ga. at 272 (3) (c) (Any error in admitting the murder victim's statements about her relationship with the defendant and his pulling a gun on her was harmless where the evidence was largely cumulative of other evidence and the overall evidence of guilt was strong.); *Davenport v. State*, 309 Ga. 385, 391 (3) (846 SE2d 83)

(2020) (Error in admitting hearsay testimony regarding the victim's statements about the defendant's threats and physical abuse was harmless where it was cumulative of other testimony about the defendant's abuse and the victim's fear.).

5. Williams also contends that his trial counsel was constitutionally ineffective in several ways. To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional

26

judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and punctuation omitted). "Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. If an appellant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *DeLoach v. State*, 308 Ga. 283, 287-288 (2) (840 SE2d 396) (2020). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts

27

de novo." *Hill v. State*, 310 Ga. 180, 187 (3) (b) (850 SE2d 110) (2020) (citation and punctuation omitted).

(a) Williams contends that his trial counsel rendered ineffective assistance by failing to admit Williams's booking photograph or testimony from his father or any other witness to prove the absence of tattoos on his left arm. But Williams did not put any booking photograph into the record in connection with his motion for new trial. Likewise, Williams failed to proffer any testimony or affidavit of his father or any witness other than himself[8] who could have testified at trial about the absence of tattoos on his left arm. Without any such proffer, we cannot say that no competent attorney would have made the same decision, under similar circumstances, not to offer Williams's booking photograph into evidence or call a witness to prove the absence of tattoos on his left arm, and Williams therefore failed to give the trial court any

---

[8] Although Williams testified at the hearing on his motion for new trial that he does not have a tattoo on his left arm, he does not claim that the absence of a tattoo should have been proved through his own testimony, and he has never claimed that his decision not to testify at trial was a result of ineffective assistance.

28

basis for finding that his trial counsel's performance was deficient in this respect. See *Foreman v. State*, 306 Ga. 567, 570-571 (3) (832 SE2d 369) (2019) (holding that defendant did not show trial counsel was deficient for failing to call a particular person as a witness and to put a photograph of that person into evidence, where on motion for new trial there was no showing of what the person would have testified and no photograph of the person was put into the record); *Walker*, 301 Ga. at 491 (4) (d) (holding that "decisions regarding which defense witnesses to call are a matter of trial strategy," and without showing what the substance of an uncalled witness's testimony would be, we could not say that no competent attorney would have made the decision not to call the witness under similar circumstances).

(b) Williams contends that he was denied effective assistance by his trial counsel's failure to object to one expert's firearm analysis report being admitted and testified to by another expert in violation of the Confrontation Clause contained in the Sixth Amendment to

the United States Constitution.[9] We conclude, however, that because this claim would have required counsel to make an argument that was an extension of the relevant existing precedent, she was not deficient.

A firearms and toolmark examiner employed with the GBI, Julie Riley, was called by the State and qualified as an expert in firearms science analysis. She explained that when the GBI receives evidence for firearms analysis, the assigned examiner performs tests and prepares a report, another trained scientist then examines the evidence and verifies the initial examiner's conclusions, and once verification is complete, the case goes to "peer review," which is an "administrative review" to ensure "that the names of the people are correct, the case numbers are correct, [and] the description of the evidence is correct," as well as a "technical review" to ensure that

---

[9] Williams also claims a violation of the hearsay rule, but because he has failed to explain why the evidence at issue constituted inadmissible hearsay, he has failed to carry his burden to show deficient performance by his trial counsel. See *Mitchell v. State*, 290 Ga. 490, 492 (4) (a) (722 SE2d 705) (2012) (holding that where the appellant failed to explain why certain evidence "constituted inadmissible hearsay," he therefore had "failed to carry his burden to show deficient performance or prejudice").

"the conclusions drawn are well supported and well documented."

As the peer reviewer in this case, Riley reviewed the worksheet prepared by the original scientist, Emily Bagwell, as well as photographs documenting the identification of the bullets and the cartridge cases. Riley testified that her conclusions did not differ at all from Bagwell's. Bagwell's signed final report was identified by Riley and admitted into evidence as a substantive exhibit without objection. Riley then testified that her conclusions were that microscopic examination and comparison of the three Winchester bullets recovered from the crime scene revealed that they were fired from the same .380-caliber pistol, that microscopic comparison of the three Winchester cartridge cases revealed that they were fired from the same .380-caliber pistol, and that it is "very possible" that both the bullets and the cartridge cases came from the same weapon. Riley also explained that the three bullets could not have been fired from a Hi-Point pistol.

In *Bullcoming v. New Mexico*, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011), the United States Supreme Court held that the

31

Confrontation Clause does not permit the prosecution to offer into evidence a "forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Id. at 652. When analyzing and applying the holding of *Bullcoming*, this Court has looked to the concurring opinion in that case, which explained, among other things, that *Bullcoming* was "not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue."[10] *Bullcoming*, 564 U. S. at 672 (Sotomayor, J., concurring in part). See also *Disharoon v. State*, 291 Ga. 45, 47-48 (727 SE2d 465) (2012) (quoting this portion of the concurring opinion in *Bullcoming* and stating that "[t]he holding in *Bullcoming* was based on the fact that the State's witness, while

___

[10] Many other courts also have looked to the concurring opinion for the same purpose. See, e.g., *Grim v. Fisher*, 816 F3d 296, 308 (III) (C) (5th Cir. 2016); *United States v. Curbelo*, 726 F3d 1260, 1275 (V) (B) (11th Cir. 2013). See also 5 Clifford S. Fishman and Anne Toomey McKenna, Jones on Evidence § 34A:30 (7th ed., Jan. 2023 update) (collecting cases).

generally familiar with the laboratory's testing procedures, had not specifically participated in, observed, or reviewed the test on the defendant's blood sample"); *Taylor v. State*, 303 Ga. 225, 230 (4) (811 SE2d 286) (2018) ("someone with a significant personal connection to the test could testify in lieu of the scientist who actually conducted it").

In this case, Bagwell's forensic report was admitted into evidence, but Riley testified about her own connection to that report. Relying on *Bullcoming*, Williams argues that Riley's review of Bagwell's report was merely administrative and amounted to proofreading. However, "*Bullcoming* does not clearly establish what degree of involvement with the forensic testing, beyond what was present in *Bullcoming*, is required of a testifying witness." *Grim v. Fisher*, 816 F3d 296, 307 (III) (C) (5th Cir. 2016). See also id. at 310 (III) (D) (holding that "*Bullcoming* does not clearly establish under what circumstances the prosecution can introduce a forensic laboratory report containing a testimonial certification by one analyst—made for the purpose of proving a particular fact . . . —

through the in-court testimony of a technical reviewer," where the technical reviewer signed the report and was more involved in the testing and reporting than was the witness in *Bullcoming*); *Bullcoming*, 564 U. S. at 673 (Sotomayor, J., concurring in part) ("We need not address what degree of involvement is sufficient because here [the testifying expert] had no involvement whatsoever in the relevant test and report."). And Georgia precedent does not clearly delineate what degree of involvement the testifying expert must have to avoid a violation of the Confrontation Clause. More specifically, there is not yet any Georgia case resolving the issue of whether the expert's testimony about the forensic testing was sufficient to comport with the Sixth Amendment where, as here, she testified that she conducted a "peer review" including a "technical review" to ensure that the certifying analyst's conclusions were thoroughly supported and documented, reviewed the analyst's worksheet and photographs, and came to her own conclusions.

Given the currently existing precedent in Georgia, Williams has not shown that his trial counsel was deficient in failing to seek

an extension of that precedent and argue an unproven theory of law by asserting below that *Bullcoming* applied to Bagwell's report and to Riley's testimony in that regard. See *Lowe v. State*, 314 Ga. 788, 796 (2) (b) (879 SE2d 492) (2022) ("[I]t is well settled that a criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (citation and punctuation omitted)); *Rhoden v. State*, 303 Ga. 482, 486 (2) (a) (813 SE2d 375) (2018) ("Counsel is not obligated to argue beyond existing precedent." (citation and punctuation omitted)).

(c) Williams contends that his trial counsel was ineffective for failing to conduct a thorough investigation by interviewing a potential self-defense witness, Stanlecia Johnson. At the hearing on Williams's motion for new trial, there was conflicting evidence as to whether his trial counsel was ever given Johnson's contact information. But in its order on the motion, the trial court assumed the truth of the testimony that Johnson's contact information was

provided to counsel.[11] The court then expressly credited counsel's testimony that Williams had told her he was not present when Coleman was murdered. The court went on to find that Williams had failed to show that his trial counsel had performed deficiently because Johnson's potential self-defense testimony would have placed Williams at the crime scene and identified him as the person who shot Coleman, and because such testimony would have contradicted the defense argued at trial that Williams was not present at the crime scene.[12]

A close examination of the trial transcript supports the trial

---

[11] Cf. *Thurman v. State*, 311 Ga. 277, 279 (857 SE2d 234) (2021) (holding that, where trial court found that trial counsel could not have contacted a potential alibi witness and that contradictory testimony in that regard was not credible, court did not err by concluding that counsel was not constitutionally deficient for failing to investigate or call the witness).

[12] During trial, Beard and another witness testified that a woman with the street name "Hypnotic" was present at Hammonds's house on the night of the murder. At the hearing on the motion for new trial, Johnson testified that she goes by the name "Hypnotic"; that she used to date Williams; that she was at Hammonds's house when the shooting occurred; that Coleman and three of his friends "bum-rushed" past Hammonds after he said they could not come in; that she saw a gun in Coleman's hand; that Coleman stood beside the table, loaded his gun, and racked the slide; that when Williams came back inside, he and Hypnotic were facing Coleman's left side; that Coleman pointed his gun at them but Williams "got off his shot first"; and that it was self-defense.

court's finding regarding the strategic nature of a decision not to pursue self-defense. Such examination reveals that the defense presented at trial and counsel's closing argument – while touching on matters that could be relevant to self-defense – focused on the credibility of the witnesses, inconsistencies in their testimony, the asserted absence of Williams from the crime scene, and alleged problems with the eyewitness identifications. Presenting this defense while rejecting an antagonistic defense based on the potential testimony of a single self-defense witness, especially when the evidence shows that the victim was shot in the back, does not reflect a strategy that was "so patently unreasonable that no competent attorney would have followed such a course," *Thomas*, 311 Ga. at 714 (2) (a), and the trial court did not clearly err in finding that Williams failed to show that his trial counsel's performance was deficient. See *Muckle v. State*, 302 Ga. 675, 680 (2) (808 SE2d 713) (2017) (holding that counsel was not deficient when he made a reasonable strategic decision not to call a witness whose testimony that he did not see the defendant on the night of the crimes would

37

have been inconsistent with the defendant's statements and would have conflicted with the defense strategy of convincing the jury that the defendant was merely present at the crime scene); *Carr v. State*, 301 Ga. 128, 129-130 (2) (a) (799 SE2d 175) (2017) (holding that it was a "matter of trial strategy and tactics within the bounds of reasonable professional conduct" not to call a problematic witness who had given contradictory statements, but instead to focus on the defense of mistaken identity and alibi and on inconsistencies in the eyewitness testimony) (citation and punctuation omitted).

(d) Williams contends that his trial counsel was ineffective because she failed to request a jury charge on self-defense. For the reasons set forth in Division 3, supra, it is not clear that Williams would have been entitled to such a charge. And as just explained in Division 5 (c), supra, self-defense would have been logically inconsistent with the defense that counsel presented at trial. Even assuming that the evidence at trial could have supported a self-defense charge, that evidence was very slight and weak, and the strategy of not presenting logically conflicting alternative defense

38

theories was objectively reasonable professional conduct. See *Talley v. State*, 314 Ga. 153, 164 (3) (c) (875 SE2d 789) (2022) ("Even assuming (dubiously) that there was slight evidence to support a self-defense charge, it was not unreasonable for trial counsel to forgo a request for that instruction and to instead focus entirely on arguing that [the appellant] was not involved in the incident at all."); *Gaston v. State*, 307 Ga. 634, 637 (2) (a) (837 SE2d 808) (2020) ("[I]t is rarely an unreasonable strategy to not pursue defenses that logically conflict."). Williams therefore has not shown that his trial counsel was deficient, and this claim of ineffective assistance fails.

(e) Williams contends that he was denied effective assistance when his trial counsel failed to visit him enough to prepare his defense properly. Counsel was appointed in October 2017, visited Williams in the jail three times before the late November trial, and testified that she probably spoke to him before and after court appearances. "As we have explained, there exists no magic amount of time which counsel must spend in actual conference with his client, and [Williams] does not specifically describe how additional

39

communications with his lawyer would have enhanced his defense." *Styles v. State*, 309 Ga. 463, 472 (5) (a) (847 SE2d 325) (2020) (citation and punctuation omitted). See also *Gittens v. State*, 307 Ga. 841, 843 (2) (a) (838 SE2d 888) (2020) ("Appellant complains that trial counsel met with him only three to five times before trial, but 'there exists no magic amount of time which counsel must spend in actual conference with his client.'" (citation omitted)). Williams also "has failed to make a proffer showing what evidence or strategy would have been uncovered through additional consultation." *Tabor v. State*, 315 Ga. 240, 245 (1) (882 SE2d 329) (2022). "Thus, [Williams] has not sufficiently alleged, much less met his burden to show, deficient performance by his trial counsel in this regard." *Blackmon v. State*, 302 Ga. 173, 175 (2) (805 SE2d 899) (2017).

6. Williams contends that the cumulative errors in his case created sufficient prejudice that he must receive a new trial. However, we have only assumed two errors by the trial court, as explained in Divisions 2 and 4, supra, and we have identified or assumed no deficient performance by trial counsel. And "we have

40

repeatedly emphasized that, 'in the evidentiary context, a defendant who wishes to take advantage of the cumulative error rule should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.'" *Dukes v. State*, 311 Ga. 561, 572 (5) (858 SE2d 510) (2021) (quoting *Lane*; punctuation omitted). Because Williams has failed to make any substantive argument or analysis other than the high number of errors that he has enumerated, "and because no such cumulative prejudice is apparent to us on this record, this claim fails." Id. at 573 (5).

*Judgment affirmed. All the Justices concur.*